Filed 3/27/14  P. v. Salazar CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038292 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS081371A) |
| v. | |
| LOUIS AGUSTINE SALAZAR, | |
| Defendant and Appellant. | |

Defendant Louis Agustine Salazar was convicted by a jury of one count of murder (Pen. Code, § 187).[1]  The trial court sentenced defendant to an indeterminate term of life in prison with the possibility of parole.  It then awarded him 1,478 days of actual custody credit and imposed a restitution fund fine of $8,500 under section 1202.4, subdivision (b).  On appeal, defendant argues that the trial court erred when it (1) admitted evidence of the victim's fingernail scrapings that were taken by a nontestifying lab technician, (2) admitted evidence of the fingernail scrapings despite gaps in the chain of custody, (3) failed to award him conduct credit, and (4) imposed a restitution fund fine.  Defendant also requests that this court independently review the sealed transcript of his *Pitchess*[2] hearing.

---

[1] Further unspecified statutory references are to the Penal Code.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

For the reasons set forth below, we modify the judgment to strike the restitution fine and to award defendant 738 days conduct credit. We affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

*The Crime*

In April 1977, 86-year-old Teressie White lived alone in Aromas, California. White's neighbor, Bruce Kleinsmith, saw her sometime in the afternoon on April 21, 1977. The next morning Kleinsmith noticed that there was a tear on White's front door screen that had not been there before. That evening, firefighter Jim Bohacek went to White's house. Bohacek noticed that the door was open and that the glass in the windowpane was broken. After entering the house, Bohacek discovered White's body lying on the bed in the bedroom. He called the sheriff's department.

Monterey County Sheriff's Deputy Joseph Anzini arrived at White's house and observed the broken glass and torn front door screen. Detective Dale Handley arrived approximately an hour later. Handley noticed that it looked like the front door had been forced open. He also saw a blue bathrobe and a chair that appeared to have been propped up against the door to keep it closed. Handley placed the robe and bloody sheets from White's bedroom into evidence. He recalled that it looked like White had been beaten on the bed. Near White's foot was a clear plastic bag with what Handley thought appeared to be marijuana. The bedroom area appeared ransacked. Handley stated that he saw Les Deicke, a lab technician with the sheriff's department, at the crime scene.

Raymond Jensen, a criminalist with the California Department of Justice in 1977, was at the crime scene that night and also saw Deicke. Jensen personally took samples from some of the blood stains at the scene. Later, he accepted into evidence fingernail scrapings that he received from Deicke on April 29, 1977. The envelope containing the fingernail scrapings was labeled "fingernail scrapings, right hand, Mrs. White, victim." Accompanying the fingernail scrapings was paperwork signed by Deicke and a

2

laboratory manager. Jensen examined the fingernail scrapings and found a small blue microscopic fiber.

Monterey County Sheriff's Sergeant Terry Kaiser was familiar with Deicke's work habits, because they had worked together for approximately three and a half years when Kaiser was an investigator. Kaiser had seen Deicke take fingernail scrapings from murder victims in more than 30 cases. Deicke would take the fingernail scrapings and place them in a manila envelope that would be booked into evidence. Kaiser was promoted in 1977 and continued to work with Deicke for another five years. Kaiser was familiar with Deicke's handwriting and explained that Deicke customarily used a fine point blue pen instead of the "big, black, bulky pen[]" often used by other technicians. Kaiser recognized the handwriting on the manila envelope containing the fingernail scrapings as Deicke's.

Dr. William Hoops, who died before defendant's trial, conducted an autopsy on White on April 23, 1977. Deicke was present during the autopsy. The autopsy report and photographs were later reviewed by Dr. John Hain, a forensic pathologist, who determined that White had died from multiple blunt force injuries, primarily to the head. Hain reasoned that based on the description in the report, White's brain was swollen and bleeding on its surface so it would have taken her 30 minutes to an hour to die from her injuries unless there was some intervening action, such as a smothering.

*The Investigation in 1977*

Richard Lee Cope, an investigator with the Monterey County Sheriff's Department, interviewed defendant in April 1977 in connection with White's murder. Defendant told Cope that at the time of the murder he was riding around in the Watsonville area with several other young people, including Vicky Berryman. Defendant said that later that night he dropped Berryman off at her house, which was close to White's residence. He also told Cope that he had marijuana in a clear plastic sandwich bag with some black tape on it. Cope looked at defendant's hands to see if there were

3

any visible abrasions or cuts since broken glass was found at the crime scene. Cope did not see any cuts or bruises, though he was trying not to be "overly observant."

*The Investigation in 1994*

In 1994, Monterey County Sheriff Gordon Sonne contacted defendant after he was assigned to work on White's homicide case. Sonne served defendant a search warrant for blood and hair samples and accompanied defendant to the medical facility where he observed defendant's blood being drawn. Sonne also served a search warrant on Berryman and observed her blood being drawn.[3]

*The Investigation in 2006*

Monterey County Sheriff's Detective Martin Opseth was assigned White's homicide case in 2006. Opseth sifted through the evidence in White's murder and sent several items over to the Department of Justice crime lab for testing, including the cuttings from the bloody sheet, the blue bathrobe found at the scene, and the fingernail scrapings.

Marianne Perhach, a senior criminalist at the Department of Justice laboratory in Watsonville, received the evidence in 2007. Perhach took the blue bathrobe and made two cuttings, one from the robe's right shoulder and another from the right arm. At trial, she stated that she took a cutting from the right arm because it looked like the suspect may have dried his or her hands on that area. Perhach sent the cuttings to a laboratory in Richmond for testing.

Angela Meyers, a senior criminalist at the Department of Justice laboratory in Richmond, received some of the samples in White's murder case. The samples included the fingernail scrapings as well as the reference blood samples from defendant and Berryman. Meyers extracted deoxyribonucleic acid (DNA) from the fingernail scrapings and created a DNA profile. The DNA contained both male and female contributors.

---

[3] Sonne refers to Berryman as "Vicky Berryman Moss" during his testimony.

4

Meyers compared the DNA profile against the male DNA profile she created from defendant's blood sample. Meyers found the DNA profiles matched across 12 loci, and she later that she believed there was strong evidence that defendant was the source of the male DNA. Meyers created a statistical analysis and determined that the probability of a random contributor having the same male DNA profile as the fingernail scrapings was "1 in 3.5 trillion for the African American population, 1 in 630 billion for the Caucasian population, and 1 in 1.3 trillion for Hispanics." Meyers compared the female DNA profile from the bloody sheets and the fingernail scrapings and found they matched on all loci.

Amy Rojas, a senior criminalist at the Department of Justice laboratory in Richmond, received the cuttings from the robe taken from White's home. Rojas tested both cuttings, and proceeded with a full testing to develop a DNA mixture profile from the cutting from the right arm of the robe. Rojas did not continue testing of the cutting from the right shoulder of the robe because that cutting did not have any male DNA. From her tests, Rojas determined that the cutting from the right arm of the robe showed a mixture of male and female DNA. Rojas compared the male DNA profile from the robe's cutting with the female DNA profile from the fingernail scrapings and the DNA profile from defendant's blood sample. Based on her examination, Rojas determined the alleles and markers from defendant's reference samples were found in the DNA profile from the robe. Rojas excluded Berryman as a contributor. She also created a statistical analysis and concluded that the probability that a random individual would be included as a possible contributor to the DNA profile mixture was "1 in 3.5 million for African Americans, 1 in 1.6 million for Caucasians, and 1 in 3.5 million for Hispanics."

Detective Opseth questioned defendant in April 2008. Defendant told Opseth that he had lived approximately a block and a half from White's house in 1977. He also told Opseth that he had no relationship to White, but he had exchanged pleasantries with her

in the past.  Defendant said he had never been inside of White's house and had never done work for her.

*The Trial and Conviction*

In January 2010, the district attorney filed an information accusing defendant of one count of murder (§ 187) with an allegation that the crime was a violent felony within the meaning of section 667.5, subdivision (c).  Prior to the trial, defendant filed a *Pitchess* motion seeking discovery of personnel records for Detective Gordon Sonne and Investigator Richard Cope on September 23, 2010.  The trial court denied the motion on December 2, 2010.

A jury trial began on February 9, 2012.  During the trial, the criminalists employed by the Department of Justice laboratories testified about their findings, including the DNA obtained from the blue bathrobe and the fingernail scrapings.  The jury convicted defendant of first degree murder on February 23, 2012.  A motion for a new trial was heard and denied on May 8, 2012.  Defendant was sentenced to life with the possibility of parole on that same day.  The trial court awarded defendant 1,478 days actual custody credit and ordered him to pay a $8,500 restitution fund fine pursuant to section 1202.4, subdivision (b).  Defendant filed a timely notice of appeal.

**DISCUSSION**

Defendant argues that his Sixth Amendment right to confrontation was violated because the fingernail scrapings taken by Les Deicke, who died before trial, were admitted into evidence.  He further argues that the fingernail scrapings lacked foundation.  Defendant also insists that he is entitled to presentence conduct credit, that the restitution fund fine imposed by the trial court should be stricken and that this court should conduct an independent review of the sealed transcripts pertaining to the *Pitchess* hearing.

1. *Confrontation Clause*

Defendant argues that the trial court violated his Sixth Amendment right to confrontation.  He contends that Deicke's handwritten notes are the only evidence

establishing that the scrapings were in fact taken from White; accordingly, he was deprived of his right to confrontation because Deicke had died by the time of defendant's trial. Defendant characterizes Deicke's handwritten notes asserting that (1) the material in the envelope was taken from White and (2) the material was taken from underneath her fingernails, as "testimonial hearsay." We disagree. Deicke's handwritten notes are not the type of testimonial evidence that would trigger defendant's rights under the Confrontation Clause.

The California Supreme Court has held that appellate courts should generally apply the de novo or independent standard of review to claims that implicate a defendant's constitutional right to confrontation. (*People v. Seijas* (2005) 36 Cal.4th 291, 304 [concluding that "independent review" applies because "the ruling we are reviewing affects the constitutional right of confrontation"].) Accordingly, we apply the de novo standard of review to defendant's claim that the trial court violated his constitutional right to confrontation.

The relevant line of authority interpreting what constitutes testimonial hearsay begins with *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). There, "the United States Supreme Court held that the introduction of 'testimonial' hearsay statements against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses, unless the witness is unavailable at trial and the defendant has had a prior opportunity for cross-examination." (*People v. Vargas* (2009) 178 Cal.App.4th 647, 653.) "Under *Crawford*, the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is testimonial or nontestimonial." (*People v. Geier* (2007) 41 Cal.4th 555, 597.) Though the court did not define or state what constitutes a testimonial statement for purposes of the confrontation clause, it observed:

"Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent--that is, material such as affidavits,

7

custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Crawford*, *supra*, 541 U.S. at pp. 51-52.)

In *Davis v. Washington* (2006) 547 U.S. 813, the Supreme Court concluded that a victim's statements to a 911 operator identifying her attacker was not testimonial. (*Id.* at p. 829.) In its decision, the court determined that the confrontation clause applied only to testimonial hearsay. (*Id.* at pp. 823-824.) The *Davis* court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822.)

Next, in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), the United States Supreme Court considered whether the admission of a sworn and notarized affidavit known as a "certificate of analysis" was properly allowed in evidence in order to prove that a substance tested positive as cocaine. "The *Melendez–Diaz* court held that the affidavits fell within the core class of testimonial statements--such as depositions, prior testimony, declarations, and affidavits--whose admission violates the Confrontation Clause. [Citation.] Therefore, the analysts were witnesses and their affidavits were testimonial, meaning that the defendant had a right to 'confront' them at his trial unless the analysts were unavailable for trial and the defendant had a previous opportunity to cross-examine them." (*People v. Barba* (2013) 215 Cal.App.4th 712, 722-

8

723 (*Barba*).) The *Melendez-Diaz* court, however, cautioned that it did not hold, and that it is not the case, "that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." (*Melendez-Diaz*, *supra*, at p. 311, fn. 1.)

In *Bullcoming v. New Mexico* (2011) __ U.S. __ [2011 U.S. LEXIS 4790] [131 S.Ct. 2705], the United States Supreme Court considered one of the issues left open in *Melendez-Diaz*: whether someone other than the person who conducted a laboratory analysis could testify about the results and report of the person who actually conducted the test. *Bullcoming* involved testing of blood for alcohol level. "The analyst recorded his results on a state-prepared form titled 'Report of Blood Alcohol Analysis.' [Citation.] The report included a 'certificate of analyst,' affirming that the sealed sample he tested was received at the laboratory intact, with the seal unbroken; the statements made by the analyst were correct; and that he had followed the procedures set out on the back side of the form. . . . [U]nder the heading 'certificate of reviewer,' a state lab examiner who reviewed the analysis certified that the person who tested the sample and prepared the report was qualified to do so and had followed the established procedures for conducting the test." (*Barba*, *supra*, 215 Cal.App.4th at p. 723.) At trial, an analyst who was familiar with the laboratory's procedures but had not participated in or observed the testing on Bullcoming's sample testified about the testing results and report. (*Ibid.*)

Justice Ginsberg delivered a four-part plurality opinion holding that the analyst's certificate was a testimonial statement. Part III of the *Bullcoming* decision, which commanded a majority of the court, explained why the analyst's certificate was testimonial. "Even though the analyst's certificate was not signed under oath, as was the case in *Melendez-Diaz*, the two documents were similar in all material respects . . . . As in *Melendez-Diaz*, a police officer provided a sample to a lab for testing to assist in a police investigation. An analyst tested the sample and prepared a certificate concerning the results. Finally, the certificate was formalized in a signed document that was

9

sufficient to qualify the analyst's statements as testimonial despite the absence of notarization present in *Melendez-Diaz*." (*Barba*, *supra*, 215 Cal.App.4th at p. 725.)

Justice Sotomayor authored a concurring opinion in which she noted that formality is not the only test to determine whether a document is testimonial. She pointed to four additional circumstances demonstrating that the analyst's certificate was testimonial. First, the state did not suggest an alternate primary purpose for the report, such as contemporaneous medical reports. Second, the person testifying about the analyst's certificate did not supervise the analyst or review the testing. Third, the testifying witness was not an expert who was asked for his or her independent opinion about underlying testimonial reports that were not themselves admitted into evidence. Fourth, the testing did not involve only machine generated results. (*Barba*, *supra*, 215 Cal.App.4th at pp. 725-726.)

Next, in *Williams v. Illinois* (2012) __ U.S. __ [2012 U.S. LEXIS 4658] [132 S.Ct. 2221], the defendant was charged with rape. Vaginal swabs containing semen were sent to Cellmark laboratory. At trial, a police laboratory expert testified that Cellmark analysts derived a DNA profile of the man whose semen was on the swabs and sent the profile to the police laboratory. In the expert's opinion, the Cellmark DNA profile matched the police laboratory's DNA profile obtained from the defendant when he was arrested for an unrelated offense. The Cellmark report was not introduced into evidence and no Cellmark analyst testified.

The *Williams* court upheld the judgment of conviction. Justice Alito authored a plurality opinion holding that testimony about the DNA tests did not violate the confrontation clause for two reasons: (1) testimony about the report was not admitted for its truth but only to explain the basis of the analyst's independent expert opinion that Williams' DNA profile matched the sperm donor's profile; and (2) the report was not testimonial because it was prepared for the primary purpose of finding a rapist who was still at large, not for targeting an accused individual. Justice Thomas' concurring opinion

10

reasoned that the report was not testimonial, even though the analyst's testimony was premised on the truth of the Cellmark lab report, because the report lacked the solemnity of an affidavit or deposition.

In 2012, the California Supreme Court issued several opinions interpreting the *Williams* decision including *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*) and *People v. Dungo* (2012) 55 Cal.4th 608.

In *Lopez*, a criminalist testified that he reviewed a lab report, created by a colleague whom he had trained, concluding that the defendant's blood alcohol level was 0.09 percent. The lab report also contained a page that was described as a " 'chain of custody log sheet.' " (*Lopez*, *supra*, 55 Cal.4th at p. 582.) The page contained a chart showing certain information filled out by hand, including " 'Booking #,' " " 'Lab Number,' " " 'Sample Sealed,' " " 'Subjects Name,' " and " 'Arresting Officer.' " This information was filled in by a laboratory assistant, who did not testify at trial. (*Id.* at p. 583.) Based on the labeling by the assistant and the machine-generated results, the prosecution's expert witness at trial gave his own opinion that concluded the defendant's blood alcohol level was 0.09 percent. (*Id.* at p. 584.)

Justice Kennard, who authored the lead opinion in which four justices concurred, reasoned that "[t]he notation in question" and the machine-generated results did not "meet the high court's requirement that to be testimonial the out-of-court statement must have been made with formality or solemnity." (*Lopez*, *supra*, 55 Cal.4th at p. 584.) Neither the analyst that tested the blood samples nor the lab assistant that entered the identifying notations "signed, certified, or swore to the truth of the contents" of the page. (*Ibid.*) The court then reasoned that "the notation on the chart linking defendant's name to blood sample No. 070-7737 is nothing more than an informal record of data for internal purposes" and was not prepared with the requisite amount of formality that would make it a testimonial statement. (*Ibid.*) The court then stated: "[W]e need not consider the primary purpose of nontestifying analyst Peña's laboratory report on the

11

concentration of alcohol in defendant's blood because, . . . the critical portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial." (*Id.* at p. 582.)

In *Dungo*, a forensic pathologist gave expert witness testimony that the victim had been strangled. His opinion was based on facts contained in an autopsy report, which had been prepared by another pathologist. The report itself was not placed in evidence. As in *Lopez*, Justice Kennard authored the lead opinion, in which four justices concurred, holding that the autopsy report was not testimonial. She reasoned that "the expert testified as to only the physical observations recorded in the autopsy report, not as to the conclusions reached by the pathologist who conducted the autopsy and prepared the report. Such observations lack the formality required under the Confrontation Clause." (*Barba*, *supra*, 215 Cal.App.4th at p. 730.) Also, autopsy reports serve several purposes and do not have the primary purpose of targeting an accused individual. Justice Chin authored a concurring opinion, joined by three justices, in which he explained that the primary purpose of the autopsy report was to describe the condition of the victim's body.

Several districts of the California Court of Appeal have published decisions applying the line of authority developed by the United States Supreme Court and the California Supreme Court, including *People v. Holmes* (2012) 212 Cal.App.4th 431 (*Holmes*). In *Holmes* the appellate court decided that the Confrontation Clause did not bar testimony by "[t]hree supervising criminalists from these labs [who] offered opinions at trial, over defense objection, based on DNA tests that they did not personally perform. They referred to notes, DNA profiles, tables of results, typed summary sheets, and laboratory reports that were prepared by nontestifying analysts. None of these documents was executed under oath. None was admitted into evidence. Each was marked for identification and most were displayed during the testimony. Each of the experts reached his or her own conclusions based, at least in part, upon the data and profiles generated by other analysts." (*Id.* at p. 434.) The *Holmes* court concluded that these documents were

12

not testimonial, reasoning: "The forensic data and reports in this case lack 'formality.' They are unsworn, uncertified records of objective fact. Unsworn statements that 'merely record objective facts' are not sufficiently formal to be testimonial." (*Id.* at p. 438.)

It is difficult to make sense from the case law in this area. (*Barba*, *supra*, 215 Cal.App.4th at p. 740.) Yet, recent appellate decisions have distilled and applied a principle that is agreed upon by a majority of the justices of the Supreme Courts of the United States and California: a statement is considered testimonial for purposes of the Confrontation Clause *only* if it possesses the attributes of formality and solemnity. (*Holmes*, *supra*, 212 Cal.App.4th at p. 436; *Barba*, *supra*, at p. 742.) The *Holmes* court explained, "The California Supreme Court has extracted two critical components from the 'widely divergent' views of the United States Supreme Court justices. [Citations.] To be 'testimonial,' (1) the statement must be 'made with some degree of formality or solemnity,' and (2) its 'primary purpose' must 'pertain[] in some fashion to a criminal prosecution.' [Citations.] . . . [¶] . . . [¶] It is now settled in California that a statement is not testimonial unless both criteria are met." (*Holmes*, *supra*, at pp. 437-438.)

Defendant insists that the statements made by Deicke were made with formality. We disagree. Deicke's labeling of the envelopes containing the fingernail scrapings does not contain a certification, attestation, or oath. His statements did not have an affidavit or some other formalized testimonial material. The statements were more of an unsworn, uncertified record, comparable to the items deemed nontestimonial in *Williams*, *Lopez*, *Dungo*, *Holmes*, *Steppe*, and *Barba*. Deicke's statements are analogous to the identifying information found on the lab report that the *Lopez* court concluded was nontestimonial.

Defendant attempts to distinguish this case from *Dungo* and *Lopez*, arguing that Deicke's claims about the origin of the biological evidence "established critical facts for the truth of the matter asserted." He distinguishes *Dungo* by arguing that the autopsy report at issue in that case was not actually admitted into evidence and that there was no dispute that the autopsy actually occurred. Similarly, he distinguishes *Lopez* by asserting

13

that there was no dispute that the blood drawn in that case was Lopez's blood.  However, *Dungo* and *Lopez* held that testimonial hearsay must be asserted for the primary purpose of criminal prosecution *and* must be sufficiently formal.  The primary purpose of Deicke's statements--that the materials in the envelope were fingernail scrapings taken from White--is irrelevant to the inquiry of whether the statements are sufficiently formal under *Dungo* and *Lopez.*[4]  (*Holmes*, *supra*, 212 Cal.App.4th at p. 438.)

Yet, defendant maintains that the only evidence of where the fingernail scrapings came from is Deicke's handwritten notes on the manila envelopes containing the samples.  He therefore asserts that we should apply the standards set by the Supreme Court in *Davis* and *Bullcoming* because of the "unique and critical role that Deicke's statements played in this case."  But as defendant himself notes, the California Supreme Court has already interpreted what qualifies as "testimonial hearsay" in *Dungo* and *Lopez* and we are bound by these interpretations.[5]

2. ***Inadequate Foundation for the Fingernail Scraping Evidence***

Defendant also contends that the evidence obtained from the fingernail scrapings lacked adequate foundation.  He insists that the trial court abused its discretion because

---

[4] Defendant also argues that evidence of Deicke's "habit or custom" of taking fingernail scrapings from murder victims does not cure the confrontation problem that arose from the admission of his statements.  Defendant's contention has merit, but Deicke's statements were not testimonial hearsay as contemplated by *Lopez* and *Dungo*.  Therefore, there is no confrontation problem with the admission of the evidence, and we need not address defendant's argument on this point.

Defendant also insists that Deicke's labeling of the source of the fingernail scrapings is testimonial evidence because the statements were made with the intent that they be used by law enforcement with the understanding that they were true.  However, we need not consider this argument as we have already determined that Deicke's statements on the envelope do not have the requisite level of formality to constitute testimonial hearsay.  Finding that the information written by Deicke on the envelopes is not testimonial, defendant's Sixth Amendment confrontation right was not violated by its introduction.

[5] Defendant argues that *Dungo* and *Lopez* were wrongly decided.

14

evidence of Deicke's "habit or custom" of collecting fingernail scrapings from murder victims did not cure the deficiencies with the chain of custody.

"The trial court has broad discretion to determine the admissibility of evidence. [Citation.]  Over a chain of custody objection, the party offering the evidence has the burden of proof of showing ' " 'to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is *reasonably certain* that there was no alteration.' " ' [Citation.]  ' " 'The requirement of *reasonable certainty* is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received.' " '  [Citation.]  ' " 'Left to such speculation,' " ' our Supreme Court cautions, ' " 'the court must exclude the evidence.' " ' " (*People v. Jimenez* (2008) 165 Cal.App.4th 75, 81 (*Jimenez*).)  We review the trial court's admission of evidence over a chain of custody objection for abuse of discretion.  (*People v. Hall* (2010) 187 Cal.App.4th 282, 294 (*Hall*).)

In *Jimenez*, the Fifth Appellate District concluded that the chain of custody of a cheek swab taken from Jimenez lacked sufficient foundation.  (*Jimenez*, *supra*, 165 Cal.App.4th at pp. 82-83.)  Jimenez was accused of robbing a bank.  (*Id.* at pp. 77-78.)  A criminalist compared DNA found on the handlebars of an abandoned bicycle tied to the robbery and a reference sample that was supposedly taken from Jimenez.  (*Id.* at pp. 79-80.)  The testifying police sergeant stated that he had made arrangements with an identification bureau technician to take a cheek swab from Jimenez and conclusorily stated that the swab had been taken.  The sergeant also testified that someone gave instructions to someone else to take the swabs to the Department of Justice for testing.  The sergeant then asserted that the swabs " 'would have been properly labeled,' " but did not provide any basis, such as personal observation, hearsay, or conjecture, that anybody took the swabs.  (*Id.* at p. 79.)  The sergeant's testimony failed to include any information about whether a technician processed, labeled, or stored the DNA sample.  (*Id.* at p. 80.)

15

The appellate court concluded that "[s]erious questions arise about what, if anything, the reference sample has to do with Jimenez." (*Id.* at p. 81.)

In contrast to *Jimenez*, the Second Appellate District in *Hall* concluded that a trial court acted within its discretion when it admitted a criminalist's testimony asserting that Hall had a blood alcohol level of 0.15 percent. (*Hall*, *supra*, 187 Cal.App.4th at p. 297.) During the trial, the criminalist testified about the procedure followed for blood withdrawal whenever a defendant is arrested for driving while intoxicated. (*Id.* at p. 291.) The criminalist also stated that she had received a blood sample in an unopened tube that bore Hall's identifying information. (*Ibid.*) Hall objected to the admission of the blood sample, citing problems with the blood's chain of custody. (*Ibid.*) The *Hall* court rejected this argument and distinguished *Jimenez* on several grounds. First, the court noted that the criminalist in *Jimenez* was tasked with comparing two separate samples, instead of just one. Further, the *Hall* court noted that unlike *Jimenez*, there was not a "high level of ease with which the particular evidence could have been altered." The court also opined that the criminalist had received a sealed evidence envelope with a properly labeled blood sample and that Hall failed to show any evidence that the sample was tampered with. (*Id.* at p. 296.) The court determined that when there is only the barest speculation that evidence was altered, " ' " 'it is proper to admit the evidence and let what doubt remains go to its weight.' " ' " (*Id.* at p. 294.)

Defendant claims that there is considerable doubt about the origin of the fingernail scrapings, as there is little to establish how the evidence was obtained. He opines that there was no testimony about who ordered Deicke to take the fingernail scrapings from White. Defendant also reasons that when the scrapings were taken in 1977, the police protocols for collecting and handling the evidence was less exacting than today's standards. Jensen, who testified at trial, explained some of the procedures he personally followed when he collected evidence. For example, he packaged the material separately. However, Deicke was unable to testify about the protocols he used to separate evidence

16

and avoid cross-contamination. Therefore, defendant insists that there are vital links missing from the chain of custody that cannot be cured.

We disagree. In defendant's case, Jensen and Handley both saw Deicke at the crime scene. Deicke was also present during White's autopsy. Kaiser testified that he worked with Deicke for a number of years and had observed Deicke take fingernail scrapings from murder victims numerous times. Evidence of Deicke's work habits was admissible under Evidence Code section 1105 to suggest that Deicke customarily took fingernail scrapings from murder victims.[6] Later, Jensen testified that he received an envelope from Deicke that was labeled as fingernail scrapings from White. Kaiser also testified at trial that he recognized the handwriting on the manila envelope containing the scrapings to be Deicke's.

It is true that the chain of custody for the fingernail scrapings is not perfect. However, the trial court could have reasonably concluded that any gaps in the chain of custody did not raise serious questions about the evidence. Defendant's argument that Deicke may have mishandled the evidence is merely speculative; there is nothing in the record that would suggest that the evidence was tampered with or contaminated. During the trial, defendant was given the opportunity to cross-examine the prosecution's witnesses to point out that none of them had actually seen Deicke take fingernail scrapings during the investigation, despite evidence of Deicke's habits. The trial court therefore did not abuse its discretion when it admitted the evidence, and it properly allowed what doubt remained to go to its weight. (*People v. Catlin* (2001) 26 Cal.4th 81, 134.)

---

[6] The trial court conducted an Evidence Code section 402 hearing on the habit or custom evidence. After hearing testimony from Kaiser, the court ruled the evidence admissible. Furthermore, there was other evidence, aside from Deicke's habit of taking fingernail scrapings, that supported the foundation that the fingernail scrapings were White's.

3. ***Presentence Custody Credit***

The probation officer concluded in his report that under section 2933.2, subdivision (a), defendant was not entitled to earn conduct credits. During the sentencing hearing on May 8, 2012, the trial court noted that it had read and considered the probation report. It then awarded defendant 1,478 days of actual custody credit and no conduct credit. Defendant argues that he should have received presentence conduct credit. The People concede this issue, and we find the concession appropriate.

As cited by the probation officer, section 2933.2, subdivision (a) restricts defendants convicted of murder from accruing presentence conduct credit. However, section 2933.2, subdivision (d) specifies that the statute is only applicable to murders that are committed "on or after the date on which [section 2933.2] becomes operative." The operative date of section 2933.2, subdivision (c), is June 3, 1998. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1317.) Defendant committed the murder on April 21, 1977. Section 2933.2 is therefore inapplicable, and defendant should be awarded conduct credit.

The current version of section 4019 specifies that it applies only to offenses committed on or after October 1, 2011. (§ 4019, subd. (h).) Section 4019 provides that conduct credit for offenses committed prior to October 1, 2011, should be calculated "at the rate required by the prior law." (*Ibid.*) Defendant was arrested on April 22, 2008. Between April 22, 2008 (the date of defendant's arrest) and January 25, 2010, the former version of section 4019 provided that defendants would earn conduct credit at a rate of two days for every four days served. (Stats. 1982, ch. 1234, § 7 [former § 4019].) Effective January 25, 2010, section 4019 was amended. (Stats. 2009-2010, ch. 28, § 50 [January 2010 version of § 4019].) However, the January 2010 version of section 4019 did not change the accrual rate of conduct credit for those defendants convicted of serious felonies. (Stats. 2009-2010, ch. 28, § 50 [January 2010 version of § 4019, subds. (b), (c)].) Accordingly, defendant continued to earn conduct credit at a rate of two days for every four days in custody.

18

Defendant is therefore entitled to 738 days of conduct credit.[7]

### 4. *The Restitution Fine*

Next, defendant argues that the trial court's imposition of an $8,500 restitution fine was made in error, because the fines were not supported by evidentiary findings necessary under the 1977 version of the statute. He also insists that the trial court's retention of jurisdiction to impose victim restitution was unauthorized. The People concede that the trial court's imposition of the restitution fine under section 1202.4 and its retention of jurisdiction to impose victim restitution were unauthorized under the applicable statutes.[8] We agree.

The trial court imposed the $8,500 restitution fund fine under section 1202.4, which was enacted in 1983 and became operative in 1984. (Stats. 1983, ch. 1092, § 320.1, eff. Sept. 27, 1983, operative Jan. 1, 1984.) Section 1202.46, which permits a sentencing court to retain jurisdiction to impose victim restitution, was enacted in 1999 and effective January 1, 2000. (Stats. 1999, ch. 688, § 3.) Restitution fines are punishment for the purposes of the prohibition against ex post facto laws. (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30-31.) Because defendant's crimes were committed before the enactment of section 1202.4 and section 1202.46, the restitution fine must be stricken and the court's jurisdiction to impose victim restitution must be vacated.

### 5. *The* **Pitchess** *Motion*

Defendant filed a pretrial motion pursuant to *Pitchess v. Superior Court*, *supra*, 11 Cal.3d 531 on September 23, 2010, seeking discovery of personnel records for Detective

---

[7] This figure is calculated by awarding defendant two days of conduct credit for every four days of actual custody. Defendant was awarded 1,478 days of actual custody credit, and is entitled to 738 days of conduct credit.

[8] The People also argue that defendant has forfeited the argument that the trial court failed to consider his ability to pay because he did not object to the fine on that ground below. We need not address this argument on appeal, as we strike the restitution fine as unauthorized.

19

Gordon Sonne and Investigator Richard Cope. The Monterey County Sheriff's Office opposed this motion. After a hearing, the trial court denied defendant's motion on December 2, 2010. Defendant requests that this court conduct an independent review of the proceedings pertaining to his *Pitchess* motion to determine whether the motion was properly denied and whether the proceedings were properly conducted. The People concede to our independent review of the sealed transcript of the *Pitchess* hearing in the interest of judicial economy.[9]

We begin our review by clarifying that the reporter's transcript filed under seal with this court on the *Pitchess* motion was not an in camera review of the personnel records relevant to defendant's claims. The hearing was an in-court hearing on the matter during which the court stated that after discussions with counsel, it believed that "there [was] insufficient justification for the Court even to peruse the personnel files of the officers who testified at the preliminary hearing based on what's been submitted at this time." The court thereafter denied the *Pitchess* motion "without prejudice to it being renewed if counsel wants to take another shot at it."[10] The trial court did not perform an in camera review of police personnel records, because it denied the motion after determining that defendant's counsel had not sufficiently shown good cause.

The California Supreme Court has "recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1219.) As described in

_____

[9] The People insist that because there is no record of the in-court proceedings held on the *Pitchess* hearing, defendant has failed to provide an adequate record and therefore has forfeited his claim on appeal. However, we conclude that defendant has supplied us with an adequate record. The sealed transcript of the *Pitchess* hearing is sufficient for our independent review.

[10] Defendant's trial counsel never filed a renewed *Pitchess* motion.

20

*Mooc*, "[w]hen a defendant seeks discovery from a peace officer's personnel records, he or she must 'file a written motion with the appropriate court' (Evid. Code, § 1043, subd. (a)) and identify the proceeding, the party seeking disclosure, the peace officer, the governmental agency having custody of the records, and the time and place where the motion for disclosure will be heard (*id.*, subd. (b)(1))." (*Id.* at p. 1226.) "In addition, the *Pitchess* motion must describe 'the type of records or information sought' (Evid. Code, § 1043, subd. (b)(2)) and include '[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records' (*id.*, subd. (b)(3))." (*Ibid.*) "The affidavits may be on information and belief and need not be based on personal knowledge [citation], but the information sought must be requested with sufficient specificity to preclude the possibility of a defendant's simply casting about for any helpful information." (*Ibid.*)

Therefore, a defendant must first show good cause. "A showing of 'good cause' exists if the defendant demonstrates both (1) a 'specific factual scenario' that establishes a 'plausible factual foundation' for the allegations of officer misconduct [citations], and (2) that the misconduct would (if credited) be material to the defense (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011). *Warrick* clarified that the materiality element requires the defendant to establish a logical link between the pending charge and the proposed defense, and to articulate how the requested discovery will support the proffered defense. [Citation.] Accordingly, defense counsel's supporting declaration must propose a defense and articulate how the requested discovery may be admissible as direct or impeachment evidence in support of the proposed defense, or how the requested discovery may lead to such evidence. [Citation.] Thus, a defendant meets the materiality element by showing (1) a logical connection between the charges and the proposed defense; (2) the requested discovery is factually specific and tailored to support the claim

21

of officer misconduct; (3) the requested discovery supports the proposed defense or is likely to lead to information that will do so; and (4) the requested discovery is potentially admissible at trial." (*Giovanni B. v. Superior Court* (2007) 152 Cal.App.4th 312, 319.)

The defendant need not present a credible or believable factual account; rather, the defendant must show a specific, plausible scenario that could have occurred. (*Warrick v. Superior Court*, *supra*, 35 Cal.4th at p. 1026.) "Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges." (*Ibid.*) "That factual scenario, depending on the circumstances of the case, may consist of a denial of the facts asserted in the police report." (*Id.* at pp. 1024-1025.)

We review the trial court's ruling on defendant's *Pitchess* motion for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.) In considering whether the trial court abused its discretion in denying defendant's *Pitchess* motion without prejudice, we have reviewed the record on appeal, including the sealed reporter's transcript of the hearing on the *Pitchess* motion held on December 2, 2010, defendant's *Pitchess* motion, the declaration of defendant's trial counsel in support of the *Pitchess* motion, and the Monterey County Sheriff's opposition to the *Pitchess* motion. We conclude that defendant failed to make an adequate showing of good cause. Defendant's trial counsel's declaration did not set forth a specific, factual scenario. The declaration broadly states that there are inconsistencies between the officers' reports and their respective testimonies during the preliminary hearing. No other information is provided as to what particular inconsistencies existed and no explanation is given as to how these inconsistencies could have supported the defense. Therefore, the trial court did not abuse its discretion when it denied defendant's *Pitchess* motion.[11]

---

[11] Defendant has moved to augment the record with the documents considered by the trial court during the in camera *Pitchess* hearing, which was not originally a part of (continued)

22

## DISPOSITION

The abstract of judgment is modified to award defendant 738 days conduct credit and to strike the $8,500 restitution fine. The trial court's jurisdiction to impose victim restitution is vacated. As modified, the judgment is affirmed.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Márquez, J.

---

the record on appeal. We deny his motion to augment, as there is no reason for us to review these documents on appeal.