[No. F052723. Fifth Dist. July 22, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND LUIS JIMENEZ, Defendant and Appellant.

COUNSEL

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Janis Shank McLean and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GOMES, J.**—Raymond Luis Jimenez appeals from a judgment of conviction of second degree robbery of a bank teller. He argues, inter alia, that the chain of custody of a reference sample of deoxyribonucleic acid (DNA) that a criminalist compared with DNA found near the crime scene was inadequate and that a prejudicial violation of his constitutional right to due process ensued. We will agree with him, will reverse the judgment, and will order a new trial.

## PROCEDURAL BACKGROUND

A jury found Jimenez guilty as charged (Pen. Code, §§ 211, 212.5, subd. (c))[1] and found true the allegations of a 2005 bank robbery prior as a serious felony prior (§§ 667, subd. (a)(1), 1170.12, subd. (c)) within the scope of the three strikes law (§§ 667, subds. (b)–(j), 1170.12, subds. (a)–(d)) and of seven circumstances in aggravation (Cal. Rules of Court, rule 4.421(a)(1), (8), (9), (b)(1), (2), (4), (5)). The court imposed an aggregate 15-year sentence (double the aggravated five-year term plus a five-year serious felony prior enhancement). (§§ 213, subd. (a)(2), 667, subd. (e)(1), 1170.12, subd. (c)(1).)

## FACTUAL BACKGROUND

On March 16, 2006, a personal banker returning from a lunch break to the bank where he worked saw a "funny looking man" ride a purple girl's bicycle around the bank parking lot. The man left the bicycle in the parking lot, pulled a hood forward over his head, and entered the bank.

Inside the bank, the hooded man cut into line, walked directly behind a customer whom a teller was attending, and handed her a note after the customer left. In an attempt to conceal his face, he held both sides of the hood so only his eyes and eyebrows were visible. The note said to give him "hundreds, fifties and twenties" and "if you don't, you'll be the first one to get it." She took the note to mean, "Give me your money or you'll die." She felt frightened and overwhelmed as if she were experiencing "an out-of-body experience."

The teller put "a little over $14,000" into the bag the hooded man handed her. As he took back the bag and the note, she ran, crying hysterically, to the break room, told the operations manager she had been robbed, and looked outside to see the robber put the bag into his pocket and ride away on a bicycle.

---

[1] Later statutory citations are to the Penal Code.

In the break room, the personal banker heard the teller say she had been robbed. He looked outside the window and saw the hooded man run to the bicycle, put the bag into his pocket, and ride away. After pursuing the man on foot, the personal banker lost sight of him but identified a bicycle abandoned nearby as the one he had seen the man ride to and from the bank.

The teller who had been robbed identified Jimenez from among photos a detective showed her as the robber. She identified the bicycle found abandoned nearby as the same type she had seen the robber ride away from the bank. In court, she testified there was no question in her mind that Jimenez was the robber.

The adjacent teller saw the hooded man commit the robbery, saw the teller he was robbing put cash into the bag, and when his hand briefly dropped from his hood saw his face from below the lips up. While the robbery was in progress, she typed a description of the robber on her word processing program. She, too, identified Jimenez as the robber from among photos a detective showed her and she, too, testified there was no doubt in her mind that he was the robber.

The personal banker could not identify anyone from among photos a detective showed him. From among those photos, he pointed to someone besides Jimenez and said he was a "possible." After a photo of Jimenez appeared in the newspaper and on television, the detective substituted a booking photo taken after the bank robbery showing Jimenez's hair pulled back tighter than in the photo the detective had showed him before. From among the latter photos, the personal banker told the detective that the robber was "close" to the new photo of Jimenez. He thought at the time of the robbery that the robber was bald due to "the way the hood was lined up on his forehead." In court, he did not know "for sure" if Jimenez was the man he saw leave the bank, put the bag into his pocket, and ride away on the bicycle since the hood was down further over his eyes than when he saw him originally but he "definitely" recognized Jimenez as the man he saw ride the bicycle to the bank.

Another bank employee was in the break room when the personal banker called her attention to the bicycle outside the bank. She looked outside and saw a man with a bag in his hand grab the bicycle, take off his hood, and ride away. She described him as a white male in his early 20's with light-colored short hair, a goatee, and a shirt with gothic print. From photo lineups a detective showed her on two occasions, one with the earlier photo of Jimenez and the other with the later photo of Jimenez, she could not identify the person she saw. In court, she testified that Jimenez looked "vaguely" similar to the man she saw.

The moment the operations manager saw a photo of the suspected robber on the news she said to herself "that's the guy that robbed the bank." Later, just before a detective showed her some photos, she told him she had seen "a picture of the guy on the news." From among the photos he showed her, she selected a photo of Jimenez as the person who "looked the most like" and who "could be" the robber. In court, she hesitated before identifying him with a certainty of seven on a scale of one to 10 as the man she saw. She did not think the photo she saw on the news influenced her identification.

A Department of Justice (DOJ) criminalist compared the reference sample in question, supposedly taken from Jimenez, with a sample of DNA taken from the handlebars of the abandoned bicycle and testified that the probability of anyone but Jimenez leaving the DNA on the left handlebar was one in 190,000 for Hispanics, one in 1.2 million for Caucasians, and one in 6.4 million for African-Americans.

## DISCUSSION

The record shows that three witnesses—a police sergeant, the chief investigating officer, and the criminalist—testified on the issue of the chain of custody of the reference sample. A summary of the relevant testimony of each of those witnesses follows.

The police sergeant testified that after Jimenez's arrest in February 2005 on the bank robbery prior, the chief investigating officer instructed him to have DNA swabs taken from Jimenez's cheek. The sergeant testified that he made arrangements with an identification bureau technician (technician) to do so and testified—conclusorily—that she did so. The sergeant testified ambiguously that either he or the chief investigating officer—he did not specify who—gave instructions to someone—he did not specify to whom—for the swabs to be sent to DOJ. The sergeant testified—conditionally—that the swabs "would have been properly labeled." He did not testify at all about the basis—whether personal observation, hearsay, or conjecture the record is silent—of his testimony that she took the swabs. The court sustained Jimenez's foundational objections to the prosecutor's questions about how, if at all, she processed the swabs, stored the swabs, and sent the swabs to DOJ and about how, if at all, he was aware the technician herself had been instructed to send the evidence to DOJ.

Citing to the record of the sergeant's testimony, the Attorney General nonetheless misreads his testimony by arguing that the technician "preserved and labeled the specimen," "was directed to send the sample to the Department of Justice," and after taking the evidence from Jimenez's cheek, "processed it, labeled it, stored it, and sent the package to the Department of Justice." To the contrary, the sergeant did not testify that the technician

preserved and labeled the specimen, did not testify that the technician was directed to send the sample to DOJ, did not testify that the technician or anyone else ever sent the sample to DOJ, and did not testify that the technician processed, labeled, or stored the sample. The technician, who presumably could have testified on each and every one of those issues, never testified. Before trial, the prosecutor released her from her subpoena so she "could go off to Italy" during trial.

The chief investigating officer testified that he requested DOJ comparison of the handlebar swabs with the cheek swabs and, over Jimenez's foundational objections, that he received a report showing that the comparison "had occurred." Though abundantly clear about his own request, the chief investigating officer's testimony was conspicuously silent, about the evidence on which the accuracy of the DOJ report was completely dependent.

Over Jimenez's foundational objections, the DOJ criminalist testified that he received from the police department two properly packaged and preserved swabs with paperwork that referred to Jimenez and that showed the submitting party was a detective who did not testify at trial, the recorded booking officer was the technician who did not testify at trial, the case number was 053907, and the incident date was January 13, 2005. His testimony belies the Attorney General's argument that the technician was the person in the police department who sent the reference sample to DOJ for comparison with the DNA from the handlebars. Elsewhere, the record shows that Jimenez entered a guilty plea in case No. 053907 to a bank robbery he committed on January 13, 2005.

Read together as a whole, the testimony of the sergeant, the chief investigating officer, and the criminalist fail to resolve key foundational issues about the chain of custody. Who labeled the swabs at the police department? Who, if anyone, sealed the swabs at the police department? Who, if anyone, segregated the swabs from other evidence at the police department to minimize the possibility of inadvertent substitution of swabs in one case for swabs in another case? Who, if anyone, at the police department put the swabs in safe storage to which only authorized persons had access to minimize that possibility? Did each and every person at the police department who had anything to do with the swabs follow established protocol for the secure transfer of evidence from one person to another within the department and from the department to DOJ? Were the swabs, if sealed by anyone at the police department, still sealed on arrival at DOJ? If so, did the criminalist himself break the seals on the swabs he analyzed? If not, who did? Did each and every person at DOJ who had anything to do with the swabs follow established protocol for the secure transfer of evidence from one person to another within DOJ? As to all of that, the record is silent.

██ Like blood and fingerprint evidence, DNA samples that are relevant to a case are indistinguishable from other samples that have no connection at all to a case. Evidence like that requires expert analysis the accuracy of which is entirely dependent on a proper chain of custody. The woefully inadequate chain of custody here raises grave concerns about whether the reference sample with which the criminalist compared the handlebar swabs came from Jimenez's cheek or from some altogether different source with no connection to him at all.

██ The trial court has broad discretion to determine the admissibility of evidence. (*People v. Williams* (1997) 16 Cal.4th 153, 196 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Over a chain of custody objection, the party offering the evidence has the burden of proof of showing " ' "to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is *reasonably certain* that there was no alteration." ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 134 [109 Cal.Rptr.2d 31, 26 P.3d 357] (*Catlin*), italics added.) " ' "The requirement of *reasonable certainty* is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received." ' " (*Ibid.*, italics added.) " ' "Left to such speculation," ' " our Supreme Court cautions, " ' "the court must exclude the evidence." ' " (*Ibid.*)

██ Here, the chain of custody amounts to nothing more than a link here, a link there, with little more than speculation to connect the links into a chain. The requisite showing of a reasonable certainty that there was no substitution is but a chimera. Serious questions arise about what, if anything, the reference sample has to do with Jimenez. (Cf. § 1405, subd. (f)(2) [authorizing DNA testing for an imprisoned felon if and only if the "evidence to be tested has been subject to a chain of custody sufficient to establish it has not been *substituted, tampered with, replaced or altered* in any material aspect." (Italics added.)]; *Catlin, supra*, 26 Cal.4th at p. 134.) The trial court's overruling of Jimenez's foundational objections to the admission of the reference sample and to the criminalist's comparison of the reference sample with the handlebar swabs was an abuse of discretion.

In the absence of fundamental unfairness, state law error in admitting evidence over a chain of custody objection is reviewable for abuse of discretion. (*Catlin, supra*, 26 Cal.4th at p. 134; *County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1448 [232 Cal.Rptr. 471].) Erroneous admission of evidence that is so prejudicial as to render a trial fundamentally unfair, however, offends due process. (*People v. Partida* (2005) 37 Cal.4th 428, 439 [35 Cal.Rptr.3d 644, 122 P.3d 765] (*Partida*), citing, e.g., *Estelle v. McGuire*

(1991) 502 U.S. 62, 70 [116 L.Ed.2d 385, 112 S.Ct. 475], and *People v. Falsetta* (1999) 21 Cal.4th 903, 913 [89 Cal.Rptr.2d 847, 986 P.2d 182].) That is so here.

Apart from the criminalist's comparison of the reference sample with the DNA found near the crime scene, nothing but eyewitness identification, some of which was inculpatory, some of which was exculpatory, connected Jimenez to the crime. With great confidence, two bank employees identified Jimenez as the robber at a pretrial photo lineup and at trial. A third identified no one from a photo lineup, said someone else's photo in that lineup was a "possible," and after seeing a photo of him in the media and a new photo of him in the later lineup said only that the robber was "close" to the person in the new photo. He definitely recognized him in court as the person he saw riding to the bank but did not know for sure if he was the person he saw leaving the bank.

A fourth bank employee, the one who saw the robber's head without the hood when he grabbed the bicycle, took off his hood, and rode away, described him as a white male in his early 20's with light-colored short hair. She could not identify Jimenez in either lineup as the person she saw outside the bank. In court, she testified that he looked "vaguely" similar to the person she saw. A fifth bank employee selected a photo of him from a photo lineup only after recognizing a photo of the suspected robber in the media. She qualified the certainty of her in-court identification as seven on a scale of one to 10.

The "dangers inherent in eyewitness identification" include not only "the effects of stress on human memory" but also the phenomena of " 'photo biased identification' " and "the likelihood that a person who was confident in making an identification was wrong." (*People v. Karis* (1988) 46 Cal.3d 612, 629 [250 Cal.Rptr. 659, 758 P.2d 1189].) Jimenez's jury could have been swayed by the confidence with which some of the eyewitnesses identified him, "but social scientists have found that such confidence does not correlate with accuracy." (Hirsch, *Confessions and Harmless Error: A New Argument for the Old Approach* (2007) 12 Berkeley J. Crim.L. 1, 18–19.) On the record here, we cannot declare that the erroneous admission on an inadequate chain of custody of both the reference sample and the criminalist's comparison of the reference sample with DNA found near the crime scene was harmless beyond a reasonable doubt.[2] (*Partida, supra*, 37 Cal.4th at p. 439.)

---

[2] In light of our holding, we address none of Jimenez's other issues (whether the inadequate chain of custody violated the confrontation clause, whether the DNA evidence was inadmissible on grounds other than the inadequate chain of custody, and whether the admission of the evidence of his bank robbery prior prejudiced him) and deny without prejudice his request for judicial notice of the testimony of another DOJ criminalist in another matter.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial. (§ 1262.)

Vartabedian, Acting P. J., and Wiseman, J., concurred.

A petition for a rehearing was denied August 14, 2008.