Filed 4/4/14  P. v. Rogers CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PHILLIP ROGERS,<br><br>    Defendant and Appellant. | B243041<br><br>(Los Angeles County<br>Super. Ct. No. BA373750) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert J. Perry, Judge.  Affirmed.

Michael S. Evans, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Tasha G. Timbadia, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Phillip Rogers was intoxicated on July 17, 2010, when the car he was driving hit Mary Webster as she was crossing the street. A jury convicted defendant of gross vehicular manslaughter while intoxicated.[1] On appeal, defendant contends his conviction must be reversed because: (1) he was denied due process and a fair trial as the result of comments made by the trial court during voir dire; and (2) the prosecution did not adequately establish a chain of custody for the blood evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Collision*

The nature of defendant's contentions does not require a detailed recitation of the facts. Viewing the evidence in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358 ), it is sufficient to state that between about 7:00 p.m. and 8:00 p.m. on July 17, 2010, defendant drank between 4 and 15 eight-ounce glasses of beer. By 8:00 p.m., defendant had a blood alcohol level of between 0.26

---

[1] Defendant was charged by amended information with gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a); count 1); vehicular manslaughter without gross negligence (Pen. Code, § 191.5, subd. (b); count 2); second degree murder (Pen. Code, § 187, subd. (a); count 3); driving under the influence causing injury with two or more priors (Veh. Code, § 23153, subd. (a); count 4); and driving with a blood alcohol level over .08 percent causing injury with two or more priors (Veh. Code, § 23153, subd. (b); count 5); various enhancements were also alleged. Following a jury trial, he was convicted on counts 1, 2, 4 and 5; the jury found true the allegation that he had suffered two prior convictions for driving under the influence, had a blood alcohol level of .15 percent or more and refused to submit to a chemical test. The jury was unable to reach a verdict on the murder charge (count 3), which the People dismissed in the furtherance of justice. Defendant admitted the prior prison term enhancement and was sentenced to 16 years to life on count 1, comprised of 15 years to life for gross vehicular manslaughter plus a consecutive one year for the prior prison term enhancement. Finding the offenses charged in counts 2, 4 and 5 to be lesser included within count 1, the trial court did not impose any sentence on those counts. Defendant timely appealed.

percent and 0.32 percent.[2] At about that time, defendant was driving south on San Pedro Street, when he hit Webster, who was crossing San Pedro between 79th and 80th Streets. A security camera at a market recorded the collision. The recording was played for the jury.

Los Angeles Police Officers Errin Burns and Kiel Kearney responded to the scene. Burns saw Webster lying in the street and defendant kneeling next to her. Defendant was very emotional. He admitted drinking four beers starting at about 7:00 p.m. and that his license was currently suspended as the result of a prior driving under the influence conviction. While Burns was speaking to defendant, a patrol car equipped with a camera arrived at the scene and Burns's interview of defendant, which was already in progress, was recorded. A DVD of the interview was played for the jury. When Officer Trovato, a drug recognition expert, arrived at the scene, he took over the interview from Burns. Trovato's interview, including his administration of field sobriety tests, was recorded by the same patrol car camera. Trovato did not testify, but a DVD of his interview was played for the jury.

B.    *The Blood Sample*

Trovato's partner that night, Officer Lashawn Robins, testified that after Trovato performed the field sobriety tests, she and Trovato transported defendant to the 77th Street Police Station where Robins tried to administer a chemical breath test. When defendant was unable to breath into the tube long enough to get a sufficient sample, he agreed to submit to a blood test. Defendant changed his mind after he was transported to

---

[2]    The blood sample taken from defendant at about 1:30 a.m. on July 18, 2010, had a blood alcohol level of 0.22 percent. Although defendant admitted to a police officer at the scene that he drank 4 eight-ounce glasses of beer beginning at about 7:00 p.m., the criminalist who analyzed defendant's blood sample estimated that defendant would have had to drink about 14- or 15-eight-ounce glasses of beer to have a blood alcohol level of 0.22 percent five hours later. The criminalist estimated that at the time of the collision, five hours before the blood sample was taken, defendant's blood alcohol would have been between 0.26 and 0.32 percent.

the jail's medical facility. He was then transported to Parker Center for a forced blood draw. At Parker Center, defendant continued to object to a blood test, but did not physically resist while his blood was being taken.

Nurse James McKeever drew defendant's blood at about 1:25 a.m. on July 18, 2010. McKeever testified that the dispensary at Parker Center keeps a stock of vacuum sealed vials (empty except for the necessary preservative material) to use for blood samples, and evidence envelopes preprinted with a form to be filled out by the officer and the person who draws the blood. In McKeever's experience, either the officer accompanying the suspect takes an empty vial, writes the date on it and hands it to McKeever or McKeever hands an empty vial to the officer, who writes the date on it and then hands it back to McKeever. McKeever then draws the subject's blood, which is sucked into the vial by the vacuum. McKeever shakes the vial to mix the preservative with the blood sample. After writing his initials and the time on the vial of blood, McKeever hands it back to the officer, who also writes the time and his initials on it. The officer then hands the vial back to McKeever, who places it into an evidence envelope. In this case, McKeever could not recall if he handed an empty vial to Trovato, or whether Trovato handed an empty vial to McKeever, but McKeever was sure that he followed the procedures just described. McKeever identified People's Exhibit No. 68 as the vial of blood McKeever drew from defendant, People's Exhibit No. 65 as the front of the evidence envelope into which he placed the vial of defendant's blood and People's Exhibit No. 70 as the back of that evidence envelope.[3] McKeever testified that he was present when Trovato filled out the top of the preprinted form on the front of the evidence envelope, including writing the case number and an acknowledgment that he observed the blood draw; McKeever filled out the bottom part of the form stating that he performed the blood draw. McKeever identified People's Exhibit No. 67 as a close up of the bottom part of the form which he filled out.

---

[3] From the record, it appears that People's Exhibit Nos. 65 through 70 were photographs of the identified items, not the actual items.

Officer Joseph Covarrubias testified that at about 6:00 a.m. on July 18, 2010, Trovato asked Covarrubias to book into evidence the evidence envelope depicted in People's Exhibit Nos. 65 and 70. When Trovato handed Covarrubias the envelope, it had already been sealed with three evidence labels in accordance with Los Angeles Police Department procedures. Either Trovato or his partner wrote Covarrubias's name and serial number on the envelope in the "booked by" box. Without opening the envelope, Covarrubias transported it to the Southwest Station and booked it into evidence at about 7:00 a.m. that day.

When criminalist Chrissy Su received the envelope containing defendant's blood sample (People's Exhibit Nos. 65, 68, 70) it was properly sealed. Su broke the seal, opened the envelope, removed the vial of blood and analyzed it. She then returned the vial containing the remainder of the blood sample to the envelope, wrote her name and the date on the bottom front of the envelope and returned the envelope to the evidence locker or property division.

At the conclusion of the People's case-in-chief, defendant challenged the chain of custody of the blood sample evidence.[4] He argued that without Trovato's testimony, there was no evidence as to the whereabouts of the blood sample between 1:30 a.m. when McKeever placed the vial in the evidence envelope and gave it to Trovato and 7:00 a.m. when Covarrubis received the evidence envelope from Trovato. According to defendant, this was a missing essential link in the chain of custody. The trial court found the testimony and documentary evidence sufficient to establish chain of custody.

---

**4**     Although defendant did not object to Su's testimony on chain of custody grounds immediately after she began testifying (see Evid. Code, § 353; *People v. Hall* (2010) 187 Cal.App.4th 282, 292 (*Hall*) [defendant did not forfeit chain of custody challenge where he raised claim after criminalist began testifying]), the People did not challenge the timeliness of the objection in the trial court, nor do they do so on appeal. Accordingly, we do not decide the issue.

## DISCUSSION

*A.   The Failure to Timely Object to the Trial Court's Comments Constitutes a
    Forfeiture of the Issue on Appeal*

Defendant contends he was denied due process and a fair trial by comments the
trial court made at the very outset of voir dire, when the prospective panel was still in the
audience.  He contends the comments amounted to a directed verdict.  We find
defendant's failure to timely object to the challenged comments and request an
admonition constitutes a forfeiture of the issue on appeal.  Even if the issue were not
forfeited, we would find no merit in defendant's contentions.

Trial courts may comment on the evidence at a criminal trial, including during voir
dire.  (Cal. Const., art. VI, § 10; *People v. Sturm* (2006) 37 Cal.4th 1218, 1232.)  But the
court "may not, in the guise of privileged comment, withdraw material evidence from the
jury's consideration, distort the record, expressly or impliedly direct a verdict, or
otherwise usurp the jury's ultimate factfinding power.  [Citations.]" (*People v. Rodriguez*
(1986) 42 Cal.3d 730, 766.)  It is unlikely that comments occurring during voir dire will
unduly influence the jury's verdict since they "obviously reach the jury panel at a much
less critical phase of the proceedings . . . .  [Citation.]" (*People v. Thomas* (2012)
53 Cal.4th 771, 797 [finding alleged prosecutorial misconduct during voir dire
harmless].)  A defendant ordinarily cannot obtain appellate relief based upon grounds that
the trial court might have addressed had the defendant availed himself or herself of the
opportunity to bring them to the court's attention.  (*People v. Fuiava* (2012) 53 Cal.4th
622, 655 (*Fuiava*) [failure to object to trial court's statements during voir dire resulted in
forfeiture of the issue].)

*People v. Seaton* (2001) 26 Cal.4th 598 (*Seaton*) is instructive.  In that case, the
defendant challenged comments made by the trial court during voir dire which "impl[ied]
it believed defendant was guilty of murder, that he used a hammer in committing the
murder, and that the special circumstance findings were a foregone conclusion." (*Id.* at
p. 635.)  The *Seaton* court rejected the contention, finding the defendant's failure to

object resulted in a forfeiture of the issue. Alternatively, it concluded the contention lacked merit because the trial court never implied a belief in the defendant's guilt and the defendant's argument to the contrary was based on isolated fragments of the trial court's comments taken out of context. (*Ibid.*)

Here, before voir dire began, the parties agreed that the trial court could summarize the case as follows for the panel of prospective jurors: "What I plan to say to the jury is the defendant is alleged to have driven a vehicle while under the influence of alcohol and to have struck and killed a woman who was [crossing the street]. It's also alleged that the defendant has three prior convictions for driving under the influence of alcohol." Before any prospective jurors had been seated in the "box", the trial court summarized the case as discussed and, without objection, added the following:

> "The issue in this case for the jury is expected to be what is the defendant responsible for under the law? He is responsible for the crime of murder or the lesser charge of gross vehicular manslaughter while intoxicated, or the lesser charge of vehicular manslaughter without gross negligence? That's going to be the principal issue, I believe, the jury is going to have to wrestle with and to decide. And of course, you'll make that decision based on the evidence that you see and hear in the trial. And so that's what this case is about.
> "*We have some cases where murder is charged, they're who-done-it cases. Everybody agrees that the person who was killed was, you know, shot to death and it's likely a murder, but they don't know who did it. This is more of a what-is-it case, what is the crime that best fits the facts of the case.* And that's up to the jury to decide, and you'll make that decision based on the evidence you're going to hear in the courtroom and then on the instructions that I will give you at the end of the trial that will set out what the law is and what is required to be proven by the prosecution to satisfy the different elements of the various crimes that will be submitted to you." (Italics added.)

Among the instructions the trial court gave to the 12 jurors and 2 alternates who were later sworn in were the following: "Keep an open mind throughout the trial. Do not make up your mind about the verdict or any issue until after you have discussed the case with the other jurors during deliberations. Do not take anything I say or do during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." Prior to the commencement of deliberations, the trial court reiterated: "It is

7

not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."

Defendant's failure to timely object to the trial court comments at the beginning of voir dire constitutes a forfeiture of the issue on appeal. (See *Fuiava, supra*, 53 Cal.4th at p. 655; *Seaton, supra*, 26 Cal.4th at p. 635.)

Even assuming that the issue was not forfeited, we would find no merit in defendant's contention. The challenged comment was unlikely to have unduly influenced the jury's verdict since it was made before voir dire even began (i.e. "at a much less critical phase of the proceedings") and was followed by repeated formal instructions that nothing the trial court said was evidence or to be taken as an indication of what the verdict should be. (*Thomas, supra*, 53 Cal.4th at p. 797; *Seaton, supra*, 26 Cal.4th at p. 635.) We also observe that defendant did not deny that he was the person who collided with Ms. Webster.

B. *Chain of Custody Was Adequately Shown*

Defendant contends the trial court erred in overruling his chain of custody objection to the blood sample analysis evidence. He argues there was no evidence of the whereabouts of the blood sample from 1:25 a.m., when McKeever handed it to Trovato, and 6:00 a.m., when Trovato gave it to Covarrubias to book into evidence.[5] We find no error.

"We review a trial court's exercise of discretion in admitting evidence over a chain of custody objection for abuse of discretion. [Citation.] A chain of custody is adequate when the party offering the evidence shows to the satisfaction of the trial court that,

---

[5] Defendant also argues that McKeever did not know Trovato and did not know what was in the empty vial McKeever used for the blood sample. But defendant does not flesh out these arguments in any meaningful way. In particular, he does not explain the significance of McKeever's lack of familiarity with Trovato. Nor does he point to a scintilla of evidence that the empty vial contained anything other than the preservative to which McKeever testified.

taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [Citation.] The reasonable certainty requirement is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citation.] However, when there is only the barest speculation that the evidence was altered, it is proper to admit the evidence and let what doubt remains go to its weight. [Citation.]" (*Hall, supra*, 187 Cal.App.4th at p. 294, internal quotations omitted.)

*Hall* is instructive. As here, the defendant in *Hall* argued evidence regarding the blood-alcohol level of his blood sample should have been excluded because of an inadequate chain of custody. (*Hall, supra,* 187 Cal.App.4th at p. 290.) In particular, the arresting officer did not testify as to what procedures he followed in having the defendant's blood drawn, and there was no evidence of the whereabouts of the sample for the three days between the time it was taken and the time the crime lab received it, or the six days following the crime lab's receipt of the sample and the criminalist's analysis of it. The court held the following evidence was sufficient to withstand a chain of custody challenge: a deputy testified that he took the defendant to the hospital to have his blood drawn and that the defendant's blood was drawn; the criminalist who analyzed the blood sample testified that she received a sealed evidence envelope that included the date and time the blood was drawn, the name of the hospital where the blood was drawn, the name of the person who took the blood, as well as an illegible signature of the arresting officer; the criminalist stated there was no indication that either the evidence envelope or the blood vial had previously been opened; the defendant introduced no evidence that the deputies, the hospital staff or crime lab officials failed to perform their duties. (*Id*. at pp. 294-297.)

By contrast, the court in *People v. Jimenez* (2008) 165 Cal.App.4th 75 (*Jimenez*) found the chain of custody of a DNA sample taken from the defendant to compare to DNA found at the crime scene was so inadequate as to compel reversal. In *Jimenez*, a

police sergeant testified that he made arrangements to have a technician swab defendant's DNA and someone instructed the technician to send the swab to the Department of Justice (DOJ). The sergeant did not testify that the technician preserved and labeled the specimen or was directed to send the sample to DOJ, that anyone ever sent the sample to DOJ or that the sample was processed, labeled, or stored. The technician did not testify. A criminalist testified that he received properly packaged and preserved swabs; the paperwork submitted with the swabs showed that the submitting party was a detective who did not testify at trial and the booking party was the technician who did not testify.

The chain of custody evidence in this case was far stronger than that in *Jimenez* and at least as strong, if not stronger, than that in *Hall*. Here, McKeever testified that he drew a sample of defendant's blood into a vial containing only preservative (People's Exhibit No. 68), and placed the blood sample into an evidence envelope (People's Exhibit Nos. 65 and 70) which he handed to Torvato. Covarrubis received the sealed evidence envelope (People's Exhibit Nos. 65 and 70) from Trovato. Thus, the evidence showed the evidence envelope containing the blood sample went from McKeever, to Trovato, to Covarrubis. Under *Hall*, this evidence was sufficient to establish chain of custody.

That McKeever did not testify he saw Trovato seal the evidence envelope, and that Trovato did not give the envelope to Covarrubis until several hours later, does not compel a contrary result. " 'While a perfect chain of custody is desirable, gaps will not result in the exclusion of evidence, so long as the links offered connect the evidence with the case and raise no questions of tampering.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 134; see also *People v. Riser* (1956) 47 Cal.2d 566, 581 [in the absence of evidence of actual tampering, the prosecution is not required to negate all possibility of tampering][6].) Here, Covarrubis testified that the envelope was sealed when he received it from Trovato and Su testified she saw nothing to indicate that the sealed evidence envelope she received, or the vial of blood inside, had been tampered with. In the absence of evidence of actual

---

[6] *Riser* was disapproved on another point in *People v. Chapman* (1959) 52 Cal.2d 95, 98.)

10

tampering, the prosecution was not required to negate all possibility of tampering. (*Catlin* at p. 134; *Riser* at p. 581.)

## DISPOSITION

The judgment is affirmed.


                                        RUBIN, ACTING P. J.

WE CONCUR:


        FLIER, J.


        GRIMES, J.

11