Filed 8/31/20  P. v Notman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JEREMY NOTMAN,<br><br>    Defendant and Appellant. | A157473<br><br>(Humboldt County<br>Super. Ct. No. CR1805781) |

A jury found defendant Jeremy Notman guilty of an arson committed with a flamethrower and a minor drug offense.  On appeal, Notman's sole contention is that the trial court prejudicially erred by admitting evidence of a metal wand alleged to be part of the flamethrower because the wand's chain of custody was inadequate.  Although we agree there were gaps in the chain of custody, we conclude that the court's evidentiary ruling was a proper exercise of discretion because these gaps went to the weight rather than the admissibility of the evidence.  Accordingly, we affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Around 4:15 a.m. on December 18, 2018, a first-floor resident of The Shadows apartment complex in downtown Eureka was in his unit when his

1

wife alerted him to something happening outside. When he exited his apartment, he saw a man using a flamethrower to spray fire underneath the complex's stairs, and he called 911. The resident described the man wielding the flamethrower as wearing a hat, a t-shirt, and jeans.

Around the same time, a second-floor resident of The Shadows was in his unit when he heard a noise like the sound of a blowtorch and opened his door to investigate. After seeing glowing light coming from the stairs, he walked outside and saw a man under the stairs who had a propane tank rigged with a hose and metal rod. The rod was dispersing flames across one wall leading to an alleyway and one wall of the complex's laundry room. The resident went back into his apartment to put his shoes on, and when he returned, he saw the man walking away down the alleyway, dragging the propane tank behind him. The resident followed the man and used a cell phone to take Live Photos of him from behind. The resident described the man as wearing a brown or camouflage jacket, a white or off-white shirt, blue jeans, and maybe a hat.

At 4:20 a.m., Officers Andrew Endsley and Jonathan Eckert of the Eureka Police Department separately heard a radio call about a person with a flamethrower at The Shadows and headed toward the scene. Officer Endsley drove around in the vicinity of the apartment complex but saw nothing unusual. Meanwhile, after walking around the first-floor area of The Shadows, Officer Eckert did not see signs of active fire and cleared the scene.

Minutes after the radio call went out about the incident at The Shadows, Sergeant Edward Wilson, who was on patrol in downtown Eureka, saw Notman walking away from the back of the Double A Bar. Notman was near some dumpsters and was holding a roughly foot-long metal wand. Notman told Sergeant Wilson that the wand was a roofing tool and that he

2

was on his way to work. Not believing him, Sergeant Wilson evaluated Notman for intoxication, determined he was unable to care for himself, and called Officer Endsley to the scene.

Officer Endsley arrived at the Double A Bar around 4:35 a.m. and, believing Notman to be under the influence of "a central nervous system stimulant such as amphetamine," handcuffed him. Officer Endsley, who had received training on flamethrowers and knew about them through his private study of military history, discussed the metal wand with Sergeant Wilson and specifically questioned whether it could be part of a flamethrower. As there was no indication that it had recently been used in a manner consistent with that of a flamethrower, however, Officer Endsley put the wand in his police cruiser without bagging it as evidence.

Notman was arrested for public intoxication, and Officer Endsley transported him to the police station for an intoxication hold. A booking deputy found a narcotic pipe in Notman's shirt pocket. At the time of his arrest, Notman was wearing brown pants, a jacket, a white shirt, and a dark sweater tied around his neck like a scarf, and he was not wearing a hat.

Around 5:15 a.m., Officer Endsley left the jail where Notman had been booked. The officer returned to the police station, where he threw the wand into an industrial-sized trash bin in the station's parking lot. He testified that the parking lot is surrounded by a cinder block wall that has an entrance and exit for vehicles and a restricted access sign posted.

Between 6:04 and 6:15 a.m., Officers Endsley and Eckert were dispatched back to The Shadows. When Officer Eckert arrived, he saw smoke coming from the laundry-room area and called the fire department. After ordering the building to be evacuated, a Humboldt Bay Fire captain observed damage to the wall showing that the studs had been smoldering for a while.

Another fire captain offered an expert opinion that the fire was caused by a person "directly put[ting] a flame into [the] dryer vent" from the outside of the laundry-room wall and that the source of the fire was not the electrical system, the gas line, or the dryer itself.

At some point later that morning, Officers Endsley and Eckert and Sergeant Wilson were talking at The Shadows when Officer Eckert had what he agreed was an "Aha! moment" connecting the wand Officer Endsley threw in the trash to the fire. Officer Eckert directed Officer Endsley to search the area for a propane tank and then retrieve the wand from the police station's dumpster. Officer Endsley later found a propane tank with an attached hose in an alley near the scene. He then went back to the police station, got the wand from the dumpster, returned to The Shadows, and gave the wand to Officer Eckert. At around 8:10 a.m., the detective assigned to the case, Detective Ronald Harpham, received the wand from Officer Eckert at the police station and secured it in a locked locker.

The only physical evidence in the prosecutor's case against Notman was the wand, and neither DNA nor fingerprints were obtained from any of the collected evidence, including the propane tank or the wand itself. Detective Harpham, who previously worked as a general contractor, testified that he was familiar with flame tools used in residential construction, although less so with flamethrowers in particular because they are "a very unique tool." Nevertheless, he determined that the wand matched the propane tank and hose found near the scene. Specifically, from looking at the screw threads on the bottom of the wand, he could tell that "a brass nipple was threaded into but then sheared off" the wand. In turn, the brass valve attached to the hose had "several threads with some pipe compound on it and . . . the threaded nipple portion of it . . . ha[d] been sheared off." Detective Harpham testified

4

that the pipe compound found on both the valve and the wand "just by eyeball . . . look[ed] consistent" and that the two "appeared to be a fit in circumference and in the way that it was broken off."

Other evidence on which the prosecution relied consisted of the Live Photos taken by the second-floor resident and surveillance footage from a gas station near The Shadows. Detective Harpham testified that the shoes of the man in one of the photos appeared to have tan soles and that the shoes Notman was wearing when booked also had tan soles. The gas station's surveillance footage showed a white man with brown upper clothing and a "flash of white up around the neckline, underneath the face" walking with a wand in his hand on the morning of the incident. Neither of the eyewitness residents of The Shadows could positively identify Notman as the man he saw with the flamethrower.

A jury found Notman guilty of both charges against him: arson of an inhabited structure, a felony, and possession of drug paraphernalia, a misdemeanor.[1] In May 2019, the trial court sentenced him to the upper term of eight years in prison for the arson and a concurrent term of one day in jail for the possession of drug paraphernalia.

## II.
### DISCUSSION

Notman argues that the admission of evidence regarding the flamethrower wand was prejudicial error and requires reversal of the arson conviction. We are not persuaded.

---

[1] The convictions were under Penal Code section 451, subdivision (b) (arson), and Health and Safety Code section 11364 (possession of drug paraphernalia).

### 1. Additional facts

Before trial, the prosecution moved to introduce evidence of the wand. The defense objected, arguing that the chain of custody was broken because the wand was in the dumpster for an uncertain amount of time. The prosecution responded that while the wand was indeed thrown in the trash, the dumpster was in a walled-off area of the police station's yard, and Officer Endsley would testify that when he retrieved the wand, it was in substantially the same condition as when he disposed of it. The trial court ruled that evidence of the wand was admissible. In doing so, it noted that because the dumpster was in a secure area inaccessible to the public, the wand was "less likely to be contaminated," and thus the gap in the chain of custody would go to the evidence's weight rather than its admissibility.

Four witnesses—Officers Eckert and Endsley, Sergeant Wilson, and Detective Harpham—offered testimony relevant to the wand's chain of custody. Sergeant Wilson, who provided the first link in the chain of custody, testified that he saw the wand in Notman's hand. This was the only direct evidence tying Notman to the wand. Although the sergeant's body camera was on during his encounter with Notman, the footage did not capture the wand in Notman's hand. Sergeant Wilson also testified that it was not unusual to encounter transient people on the streets of Eureka at that time of day and that he often saw them going through dumpsters looking for salvageable items. Thus, although he knew about the incident at The Shadows when he first saw Notman with the wand, his initial impression was that the object was "just a long pipe."

Similarly, Officer Endsley, the next person to come into contact with the wand, testified that his initial assessment of the object was that it "just seemed to be a piece of street trash that [Notman] might have picked up."

Officer Endsley threw the wand in the dumpster at some point between 5:15 a.m., when he left the jail where Notman was booked, and 6:04 a.m., when he was dispatched back to The Shadows. Although the officer was wearing his body camera that morning, it was not on when he retrieved the wand from the dumpster.

Officer Endsley's last contact with the wand was sometime after 6:04 a.m., when he again returned to The Shadows after retrieving the wand from the trash and gave it to Officer Eckert. Officer Eckert testified that he received the wand before handing the scene over to Detective Harpham. The timing of these interactions is not documented. Finally, Detective Harpham testified that he received the wand from Officer Eckert at the police station at about 8:10 a.m., where it was secured in a locker in his office.

2.      Discussion

Notman argues that the trial court prejudicially erred in admitting evidence of the wand. We disagree, and we must therefore affirm even though we acknowledge the evidence of Notman's guilt was weak.

"In a chain of custody claim, ' "[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 134

(*Catlin*).) Although " 'a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering.' " (*Ibid.*, quoting Mendez, Cal. Evidence (1993) § 13.05, p. 237.) A trial court's admission of evidence over a chain-of-custody objection is reviewed for an abuse of discretion. (*Catlin*, at p. 134.)

Notman contends that it is not reasonably certain the wand analyzed was the one taken from him. He focuses on the time the wand was in the police station's dumpster, calling it a "vital link in the chain of possession." (*People v. Lucas* (1995) 12 Cal.4th 415, 444.) He points out that Officer Endsley could not testify as to when exactly he threw the wand in the dumpster or when he retrieved it. We agree with Notman that this constituted a break in the chain of custody. And the record reveals that another break occurred after Officer Endsley gave the wand to Officer Eckert, since there is no indication of how or where the wand was stored while in Officer Eckert's possession. Together, these breaks created a nearly three-hour period during which the wand was not accounted for.

Nonetheless, we cannot conclude that the trial court erred by finding, after "taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, [that it was] reasonably certain that there was no alteration." (*Catlin, supra,* 26 Cal.4th at p. 134.) In arguing to admit the wand, the prosecution asserted that the circumstances were similar to those in *People v. Laursen* (1972) 8 Cal.3d 192. In *Laursen*, the police did not have proper tools with them to open and search an immobile car suspected of being used in the commission of an armed robbery, so the vehicle was impounded to be stored at a police garage before further examination. (*Id.* at p. 202.) Fingerprints matching

8

the defendant's were later lifted from the vehicle. (*Ibid.*) The defendant attempted to create an inference that the fingerprints had been tampered with and argued on appeal that the fingerprints should have been excluded. (*Ibid.*) Rejecting this argument, our state Supreme Court noted that had the police failed to secure the car, the defendant, or others acting on his behalf, would have had the opportunity to tamper with the evidence. (*Ibid.*) The Court held that because the defendant " 'did not point to any indication of actual tampering, did not show how fingerprints could have been forged, and did not establish that anyone who might have been interested in tampering with the prints knew' where they were or had access to them, it was proper to admit the evidence and permit the speculation urged by [the] defendant to go to its weight." (*Ibid.*)

Although not explicitly relied on by the defense below, *People v. Jimenez* (2008) 165 Cal.App.4th 75 (*Jimenez*) is one of the few published decisions to discuss in detail what type of gap in the chain of custody renders a piece of evidence inadmissible. In *Jimenez*, DNA swabs were taken from the handlebars of a bicycle used by a bank robber and abandoned near the crime scene. (*Id.* at p. 79.) A criminalist compared the DNA found on the bicycle with a reference sample supposedly taken from the defendant. (*Id.* at pp. 79–80.) The technician who purportedly collected the sample from the defendant, documented it, and sent it to the Department of Justice did not testify. (*Id.* at p. 80.) Instead, at trial a police sergeant testified "conclusorily" that he made arrangements with a technician to take DNA swabs from the defendant and then either he or the chief investigating officer instructed someone to send the swabs to the criminalist at the Department of Justice, and the criminalist testified that he received the swabs. (*Id.* at pp. 79–80.)

9

The Fifth District Court of Appeal found this chain of custody to be "woefully inadequate," concluding that it "amount[ed] to nothing more than a link here, a link there, with little more than speculation to connect the links into a chain." (*Jimenez, supra*, 165 Cal.App.4th at p. 81.) Because "serious questions ar[o]se about what, if anything, the reference sample ha[d] to do with" the defendant, "the requisite showing of a reasonable certainty that there was no substitution" was not met, and reversal was required. (*Id.* at pp. 77, 81.)

We are unconvinced that the breaks in the wand's chain of custody leave open "key foundational issues about the chain of custody." (*Jimenez, supra*, 165 Cal.App.4th at p. 80.) *People v. Hall* (2010) 187 Cal.App.4th 282 (*Hall*), which distinguished *Jimenez*, is instructive. The *Hall* defendant claimed that it was error to allow a criminalist to testify about the defendant's blood-alcohol level because "there was no evidence to show who took [his] blood sample, who delivered the blood sample to the crime lab, and how the blood sample was transferred [between crime labs]. He also [pointed] out that the criminalist was unable to testify as to the whereabouts of the blood sample during the three days before the crime lab received it and the six days following the crime lab's receipt of the blood sample." (*Hall*, at p. 294.)

The Second District Court of Appeal rejected the defendant's reliance on *Jimenez*, describing the chain-of-custody testimony in *Jimenez* as providing "no reasonable certainty that the DNA sample purportedly obtained from the defendant and the crime scene DNA had not been substituted for one or the other." (*Hall, supra*, 187 Cal.App.4th at p. 296.) In other words, it was not reasonably certain that the *Jimenez* sample actually came from the defendant. (*Hall*, at p. 295.) In contrast, the *Hall* defendant

10

remembered having his blood drawn and there was only one sample in play, meaning that "high level of ease with which the particular evidence could have been altered" was "not present" like it was in *Jimenez.* (*Hall*, at p. 296.)

We find the circumstances here to be more similar to those in *Laursen* and *Hall* than to those in *Jimenez.* The links in the chain of custody that were established here connected the wand to the case and raised no serious questions of tampering. (See *County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1448.) Nor does anything in the record suggest that the wand ultimately examined by Detective Harpham was not the wand retrieved during Notman's arrest. While we agree with Notman that any alteration of the wand while it was in the dumpster would have been more likely due to damage than tampering, Notman points to nothing in the record that gives even an inkling that such an alteration actually occurred. (See *People v. Riser* (1956) 47 Cal.2d 566, 581.) As a result, we cannot conclude that the trial court abused its discretion in determining that the remote possibility of the wand's alteration went to the evidence's weight and not to its admissibility. (See *Catlin, supra*, 26 Cal.4th at p. 134 [" ' "when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight" ' "].)

### III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.

WE CONCUR:


_____

Margulies, J.


_____

Sanchez, J.


*People v. Notman*  A157473

12