Filed 9/18/14  P. v. Newell CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN HOWARD NEWELL,<br><br>Defendant and Appellant. | F066555<br><br>(Super. Ct. No. F11905538)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jane Cardoza, Judge.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Leanne Le Mon and Louis M. Vasquez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

John Howard Newell (defendant) stands convicted, following a jury trial, of second degree robbery, during the commission of which he personally inflicted great bodily injury. (Pen. Code,[1] §§ 211, 12022.7, subd. (a).) Following a bifurcated court trial, he was found to have suffered a prior serious felony conviction (§ 667, subd. (a)(1)) that was also a strike (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and to have served three prior prison terms (§ 667.5, subd. (b)). His request to dismiss the prior strike conviction was denied, and he was sentenced to a total of 21 years in prison and ordered to pay various fees and fines.

On appeal, we hold (1) the trial court did not erroneously instruct the jury it could consider the certainty of the identification in evaluating eyewitness identification testimony, and (2) defendant is not entitled to have the restitution fine imposed pursuant to section 1202.4 modified downward. We affirm the judgment.

## FACTS

## I

### PROSECUTION EVIDENCE

On September 21, 2011, Levi Moscowitz was passing through Fresno when he came in contact with Natasha Embry, who said her name was "Cherry Blossom" and whom he believed to be a prostitute. Embry invited Moscowitz to the Fresno Inn, where she took him to room 609. Someone Embry identified as her brother (and whose name Moscowitz later learned was Gregory Jones) was fixing a bicycle inside the room. Embry and Jones started to argue, and Jones told Moscowitz to come back in about 15 minutes so they could sort things out.

Moscowitz left to have lunch and returned in 15 to 20 minutes. Room 609 was empty. An older woman on the top floor asked what he was doing. When he said he was

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

2.

looking for "Cherry," the woman said she should be back soon. Moscowitz waited around 15 to 20 minutes.

A woman and two men were sitting on the stairs, talking.[2] One of the men was a heavyset, younger male with orangeish hair, a goatee, and tattoos on his arm. The other was a skinny, younger male. While Moscowitz was waiting, defendant walked upstairs and to the left. He was carrying a toolbox or something in his hands. Moscowitz thought he worked there, because someone addressed him as "John," asked him how his morning was going, and mentioned something about repairing the carpet. Moscowitz did not know where defendant went, but room 609 was to the left on the second floor.[3] The woman whispered something to one of the men on the stairs, and he also went upstairs.[4] He also turned left, although Moscowitz did not see if he went into a room. The other man remained on the steps.

The woman introduced herself to Moscowitz as "Cherry's" sister. She told him to go back to room 609. As Moscowitz opened the door and walked inside, he was attacked by two people who were already in the room, waiting behind the door. They pushed Moscowitz to the ground and hit him on the head for about three minutes. He did not know if they were using an object or fists, but his head was being pounded with something heavy. While this was going on, they took his wallet, keys, and phone from his pockets. They took his debit card and asked if he had any cash. When he said he did not, they asked for the personal identification number (PIN) for his debit card so they

---

[2]    There was a stairway in the middle of the hotel.

[3]    Defendant lived in room 405, which was a different direction. Room 609 was not rented to anyone on this date.

[4]    The Fresno Inn manager identified a photograph of this man as Frank Riddle. He lived at the Fresno Inn until he was evicted, and occasionally was seen with defendant. During the summer of 2011, defendant did some repair work for the hotel, for which he received a small rent credit.

could get cash from an ATM. When he said he did not know it, they looked at his license, and said they knew where he lived and would kill him and his family if he called the police.

Toward the beginning of the beating, Moscowitz was able to turn his head enough to get a look at one of his assailants. It was defendant; he was hitting Moscowitz on the head with his hands or something. Moscowitz did not see which hand defendant was using. Moscowitz was able to see him for about five seconds, even though it was kind of dark in the room because the door was closed and the window shades were partially closed.[5] Moscowitz "[i]nstantaneously" recognized him from having seen him outside minutes earlier. Defendant was the one who asked about the PIN for the debit card. Moscowitz recognized his voice from when defendant replied to the people who addressed him as he went up the stairs.[6] Defendant told Moscowitz to wait in the room for 10 minutes while they left, and said if Moscowitz came outside before that, they would kill him.

All told, Moscowitz was in the room with his assailants for around four or five minutes before they left. He went into the bathroom and saw he was bleeding from his head. He waited around five minutes, then ran outside to the street. As he came outside, he saw his rental car "peel out" of the parking lot. He was unable to see who was inside.

Moscowitz flagged down a passing truck, the driver of which called 911. The call was made at 2:26 p.m., and the police arrived within five minutes. Moscowitz told the officer he was at the Fresno Inn because he had become lost on his way from Lodi to Bakersfield and had stopped to ask for directions. He denied being there for drugs or a

---

**5**      Moscowitz estimated the window shades were open about a foot. It was the middle of the day, and there was still light coming into the room.

**6**      Moscowitz was unable to say whether the second man was the person who had been sitting on the steps and then gone upstairs.

4.

prostitute, and said that when he asked for directions, he got dragged into the room. Moscowitz lied because he was scared and did not want to get into trouble himself.

Moscowitz suffered two gashes in his head that required four staples to close, and three fractured fingers that were broken when he used his hands to try to protect his head. While he was at the hospital, he spoke with Detective Phebus and admitted he had not been truthful with the first officer about what had happened and why he was at the Fresno Inn. Based on information Jones was seen leaving the area about the time the robbery occurred, Jones was brought to the hospital to see if Moscowitz could identify him. Moscowitz recognized him, but said he was not involved in the robbery.

Room 609 was processed for fingerprints and evidence on the day of the robbery. Embry's fingerprint was found on a Styrofoam cup inside the room. There were bloodstains on the mattress and probable blood splatter on the wall at the head of the bed. On the bathroom vanity were an empty beverage can and other items. Jones's thumbprint and a fingerprint from Ruth Ransier were found on the can.[7] Ransier was the woman purporting to be "Cherry's" sister. An unidentified print was found on a piece of paper on the hotel room dresser.

Police recovered the rental vehicle early the next morning. Casey Keenan was in the car. Twelve usable prints were found on CD's inside the vehicle. Eight of the prints belonged to Keenan. No prints of comparison value were found anywhere else in or on the vehicle.

Keenan provided information about someone at the Fresno Inn called Little John. Police determined this was defendant, who matched the name and age description Moscowitz had given for one of the robbers. That same day, defendant was detained at

---

**7** No fingerprints were recovered from the door, doorknobs, or light fixtures. Scott West, a supervisor in the Fresno Police Department's Crime Scene Investigation Bureau who processed the room, explained that it is fairly rare to get usable fingerprints — fingerprints of comparison quality — on most surfaces.

the Fresno Inn with Riddle and Anthony Stelton. Moscowitz subsequently was shown two or three photographic lineups, each of which contained six photographs. He "[i]nstantaneously" recognized defendant in one. Moscowitz recognized him from his mustache and the shape of his face. Shown a photographic lineup containing Riddle's picture, Moscowitz stated he did not recognize anybody, although he looked at Riddle's photograph for eight or nine seconds. Moscowitz was also shown photographic lineups containing Keenan's and Stelton's pictures and said he did not recognize anyone.

No matches to defendant's or Riddle's prints were found in the hotel room or the vehicle. None of the stolen items were found in defendant's possession. However, the global positioning system monitor lawfully attached to defendant placed him in or near room 609 around the time of the robbery. The monitor further showed he remained in the area of the Fresno Inn complex after the robbery.

## II

### DEFENSE EVIDENCE

One afternoon in September 2011, Marshall White was at the Fresno Inn when he saw a man running. The man was "full of blood" and, knowing the bad things that happened at the hotel every day, White believed he had been robbed. At the time White saw this man, White was on an upstairs balcony, smoking a cigarette. Defendant was with him. Defendant had a job cleaning out the rooms, and White was helping. They were at room 240 or 243.[8] Defendant said he was going to see what was going on, so he went in the direction from which the man had run.

Jeff Gunn was defendant's investigator from January 10, 2012, to May 11, 2012. The middle finger or knuckle of defendant's right hand was "obviously" dislocated or possibly broken during that entire period of time. As a result, defendant could not completely clench his fist.

---

[8] According to Phebus, there were no such room numbers at the Fresno Inn.

## DISCUSSION

### I

### EYEWITNESS IDENTIFICATION INSTRUCTION

Defendant requested that the court give CALCRIM No. 315 (Eyewitness Identification). During the jury instruction conference, defense counsel stated he had no objection to the giving of the instruction. He did not ask that any of the factors listed therein be modified or omitted. The trial court subsequently instructed the jury with the standard instruction, as follows:

> "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.

> "In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event. How well could the witness see the perpetrator. What were the circumstances … affecting the witness's ability to observe such as lighting, weather conditions, obstructions, distance, and duration of observation. How closely was the witness paying attention. Was the witness under stress when he or she made the observation. Did the witness give a description and how does that description compare to the defendant. How much time passed between the event and the time when the witness identified the defendant. Was the witness asked to pick the perpetrator out of a group. Did the witness ever fail to identify the defendant. Did the witness ever change his or her mind about the identification. *How certain was the witness when he or she made an identification*. Are the witness and the defendant of different races. Was the witness able to identify other participants in the crime. Was the witness able to identify the defendant in a photographic lineup. Were there any other circumstances affecting the witness's ability to make an accurate identification.

> "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (Italics added.)

Defendant now contends the trial court committed prejudicial error, and violated his right to due process, by including the italicized factor. Defendant recognizes the United States Supreme Court has included "level of certainty" as a factor to be

7.

considered in evaluating whether an identification should be suppressed due to unduly suggestive identification procedures. (*Neil v. Biggers* (1972) 409 U.S. 188, 199 (*Biggers*); see *Manson v. Brathwaite* (1977) 432 U.S. 98, 114.) He says, however, more recent authorities and social science research establish that certainty of an identification has little, if any, correlation to the accuracy of an identification. (See, e.g., *People v. McDonald* (1984) 37 Cal.3d 351, 369, overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914; *People v. Jimenez* (2008) 165 Cal.App.4th 75, 82; *State v. Ledbetter* (Conn. 2005) 881 A.2d 290, 311; *Brodes v. State* (Ga. 2005) 614 S.E.2d 766, 769-771.) Accordingly, the argument runs, defendant's jurors should not have been instructed they could consider certainty of identification in assessing accuracy of identification.

A defendant in a criminal trial "is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [Citation.]" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230; accord, *People v. Wright* (1988) 45 Cal.3d 1126, 1141 (*Wright*).) The instruction should list only those factors that are applicable to the evidence at trial, and should not take a position as to the impact of the factors listed. (*People v. Johnson*, *supra*, 3 Cal.4th at p. 1230; *Wright*, *supra*, 45 Cal.3d at p. 1141.) "[A]n explanation of the *effects* of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*Wright*, *supra*, at p. 1143, fn. omitted; accord, *People v. Fudge* (1994) 7 Cal.4th 1075, 1110.)

The California Supreme Court has held that "CALJIC No. 2.92 or a comparable instruction should be given when requested in a case in which identification is a crucial issue and there is no substantial corroborative evidence. [Citation.]" (*Wright*, *supra*, 45 Cal.3d at p. 1144.) Although opinions might differ concerning whether the global positioning system monitor evidence in the present case constituted substantial

corroborative evidence of Moscowitz's identification of defendant as one of his assailants, there can be no doubt the accuracy of that identification was a crucial issue at trial. Both the prosecutor and defense counsel discussed it at length during their summations, and the jury requested that Moscowitz's testimony be read back to them. Clearly, the trial court did not err by giving CALCRIM No. 315 — CALJIC No. 2.92's counterpart — upon defendant's request. Moreover, the trial court had no sua sponte duty to modify the instruction. (*People v. Ward* (2005) 36 Cal.4th 186, 213-214; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 561; cf. *People v. Alcala* (1992) 4 Cal.4th 742, 802-803.) Accordingly, having failed to request excision of the factor whose inclusion he now challenges, defendant cannot be heard to complain. (See *People v. Martinez* (1987) 191 Cal.App.3d 1372, 1384.)

In any event, the California Supreme Court recognized, as long ago as 1984, that studies indicate a lack of correlation between the degree of certainty or confidence an eyewitness expressed in an identification and the accuracy of that identification. (*People v. McDonald*, *supra*, 37 Cal.3d at p. 369.) Nevertheless, the court approved CALJIC No. 2.92 at a time when that instruction included a certainty factor. (*Wright*, *supra*, 45 Cal.3d at pp. 1144, 1165-1166, appen.; see *People v. Martinez*, *supra*, 191 Cal.App.3d at p. 1383 & fn. 12.) It has maintained its endorsement of the instruction even against a claim there was no evidence to support the certainty factor. (*People v. Johnson*, *supra*, 3 Cal.4th at pp. 1231-1232.) It has also continued to use the factors set out in *Biggers*, *supra*, 409 U.S. 188 — which, as previously noted, includes the certainty factor (*id*. at p. 199) — in determining the reliability of identification evidence against a claim the identification procedure was unduly suggestive. (*People v. Kennedy* (2005) 36 Cal.4th 595, 610-611, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Defendant would have us reject these authorities because "both legal authorities and research on eyewitness identification have changed dramatically since" they were

decided. We are bound, however, by the decisions of our state Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[9] Moreover, the United States Supreme Court has adhered to *Biggers* — including its certainty factor — in describing the analysis to be undertaken in determining whether due process requires suppression of an eyewitness identification tainted by law enforcement arrangement. (*Perry v. New Hampshire* (2012) 565 U.S. ___, ___-___ & fn. 5 [132 S.Ct. 716, 724-725 & fn. 5].)

In our view, excising the certainty factor from CALCRIM No. 315 — particularly absent a request therefor or evidence on the subject — would effectively endorse those social science or research studies and results that discount or explain the impact of

---

[9] Although the cited decisions deal with CALJIC No. 2.92, defendant does not claim there is any meaningful difference between that instruction and CALCRIM No. 315.

Defendant says none of the opinions considered or decided whether the certainty factor violated the federal or state Constitution. Approval of the instruction implies it does not violate the Constitution. In any event, the California Supreme Court has consistently applied the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, which is applicable to state law error, to errors involving the eyewitness identification instruction in general (*Wright, supra*, 45 Cal.3d at p. 1144) and inclusion of the certainty factor in particular (*People v. Ward, supra,* 36 Cal.4th at p. 214).

Defendant fails to convince us inclusion of the certainty factor effects a federal constitutional violation. As listed in CALCRIM No. 315 (and, for that matter CALJIC No. 2.92), the factor is neutrally phrased so that it applies not only when the eyewitness was certain of the identification, but also when he or she was *not* certain. Whatever the lack of positive correlation between certainty and accuracy, we are aware of nothing that suggests *lack* of certainty may not indicate *lack* of accuracy. Moreover, the factor is but one of many the instruction tells jurors to consider, and jurors are expressly told also to consider any other circumstances affecting the witness's ability to make an accurate identification. In addition, the instruction makes clear the prosecution has the burden of proving, beyond a reasonable doubt, that the defendant was the person who committed the crime(s). Under these circumstances, inclusion of the factor — even if error — does not "'so infect[] the entire trial that the resulting conviction violates due process.' [Citations.]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

certainty of identification on reliability of identification, and thus would conflict with the state Supreme Court's admonition against doing so. As that court stated in *Wright*, *supra*, 45 Cal.3d at page 1141: "[A proper instruction on eyewitness identification] should *not* take a position as to the *impact* of each of the psychological factors listed. We disagree with the dissent's suggestion that CALJIC No. 2.92 is 'deficient' for failing to explain the effects of the enumerated factors. ([*Wright*, *supra*, at] p. 1157 [(dis. opn. of Mosk, J.)].) An instruction that 'explained' the influence of the various psychological factors would of necessity adopt the views of certain experts and incorporate the results of certain psychological studies while discounting others. It would require the trial judge to endorse, and require the jury to follow, a particular psychological theory relating to the reliability of eyewitness identifications. Such an instruction would improperly invade the domain of the jury, and confuse the roles of expert witnesses and the judge."

"If the defendant wishes to present to the jury information on the unreliability of eyewitness identifications under a particular set of circumstances, he must use means other than a jury instruction, such as expert testimony. [Citation.]" (*Wright*, *supra*, 45 Cal.3d at pp. 1153-1154.) Defendant here did not do so. He did, however, vigorously challenge the accuracy of Moscowitz's identification. The trial court did not err by including the certainty factor as one of many jurors were allowed to consider.[10]

## II

### AMOUNT OF RESTITUTION FINE

Defendant committed the present crime on September 21, 2011. At the time, section 1202.4, subdivisions (b) and (c) required imposition of a restitution fine in every case in which a person was convicted of a crime, unless the court found "compelling and

---

[10]    In light of our analysis, we need not address defendant's alternative claim that any forfeiture of the issue constituted ineffective assistance of counsel.

extraordinary reasons for not doing so," and stated those reasons on the record. Subdivision (b) of the statute further provided:

"(1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony ….

"(2) In setting a felony restitution fine, the court may determine the amount of the fine as the product of two hundred dollars ($200) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."

Subdivision (b)(1) of section 1202.4 subsequently was amended to raise the minimum restitution fine to $240, starting January 1, 2012, and $280, starting January 1, 2013. Subdivision (b)(2) of the statute was amended to permit the trial court to calculate the amount of the fine as the product of the applicable minimum fine times the number of years times the number of felony counts of which the defendant was convicted. (Stats. 2012, ch. 868, § 3.)

Defendant was sentenced on January 23, 2013. The probation officer's report recommended, and the trial court imposed, a restitution fine pursuant to section 1202.4 in the amount of $5,040.[11] No mention was made of the manner in which the fine was calculated.

Defendant now says the fine must be reduced to $4,200, or the matter remanded, because, he surmises, the trial court used the formula contained in the version of the statute that was not yet in effect when defendant committed his crime. Defendant says

---

[11] The probation officer's report also recommended, and the trial court imposed and stayed, pending revocation of parole, a parole revocation restitution fine in the same amount pursuant to section 1202.45. Our discussion of the fine imposed pursuant to section 1202.4 applies equally to the fine imposed pursuant to section 1202.45.

12.

the court's error violated the ex post facto clauses of the federal and state Constitutions and his right to due process, and resulted in an unauthorized sentence.

"The Constitution forbids the passage of *ex post facto* laws, a category that includes '[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.' [Citation.]" (*Peugh v. United States* (2013) 569 U.S. ___, ___-___ [133 S.Ct. 2072, 2077-2078]; accord, *Collins v. Youngblood* (1990) 497 U.S. 37, 41-42.) "It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143; accord, *People v. Saelee* (1995) 35 Cal.App.4th 27, 30.)

The United States Supreme Court recently held that an increase in the applicable sentencing range under the federal Sentencing Guidelines implicates ex post facto concerns, even though the Guidelines are no longer mandatory. (*Peugh v. United States*, *supra*, 569 U.S. at pp. ___-___, ___-___ [133 S.Ct. at pp. 2079-2080, 2082-2088].) Primarily from this decision, defendant concludes the change in the discretionary formula set out in section 1202.4, subdivision (b)(2) is also subject to ex post facto considerations.

We see a significant difference between a change in the Sentencing Guidelines, which, although discretionary, are the mandatory starting point for imposition of a federal sentence and "remain a meaningful benchmark through the process of appellate review" (*Peugh v. United States*, *supra*, 569 U.S. at p. ___ [133 S.Ct. at p. 2083]), and the type of optional formula contained in section 1202.4, subdivision (b)(2). Nevertheless, we need not decide whether defendant is correct (see *People v. Martinez* (2014) 226 Cal.App.4th 1169, 1189, petn. for review pending, petn. filed July 14, 2014): By failing to object to the amount of the restitution fine at sentencing, he has forfeited his claim for purposes of appeal.

A trial court has broad discretion to determine the amount of a restitution fine within statutory parameters. (§ 1202.4, subd. (b)(1); *People v. Kramis* (2012) 209

13.

Cal.App.4th 346, 350; cf. *People v. Griffin* (1987) 193 Cal.App.3d 739, 741 [addressing former Gov. Code, § 13967].) "The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review. [Citations.]" (*People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831.)

"[C]laims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" are forfeited when, as here, they are raised for the first time on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 353; accord, *People v. Smith* (2001) 24 Cal.4th 849, 852.) This is so even when they involve the asserted violation of constitutional rights. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.)

The California Supreme Court has created a "narrow" exception to the forfeiture rule for unauthorized sentences. (*People v. Smith, supra,* 24 Cal.4th at p. 852.) "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed *under any circumstance in the particular case*. Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing. [Citation.]" (*People v. Scott, supra,* 9 Cal.4th at p. 354, italics added.) By contrast "claims deemed [forfeited] on appeal involve sentences which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner." (*Ibid.*)

Defendant contends the amount of the restitution fine imposed in the present case was unauthorized, and so his claim of error is reviewable on appeal despite his lack of objection in the trial court. We disagree. The trial court had discretion to impose a restitution fine in an amount up to $10,000, and was not required to employ — or even take into account — the calculation method set out in the statute. Rather, the court was only required to "consider any relevant factors, including, but not limited to, the

14.

defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime." (§ 1202.4, subd. (d); cf. *People v. Griffin*, *supra*, 193 Cal.App.3d at pp. 741-742 [in setting amount of restitution fine under former Gov. Code, § 13967, trial court properly considered defendant's criminal history as set out in probation officer's report]; *People v. Wyman* (1985) 166 Cal.App.3d 810, 815-816 [in setting amount of restitution fine under former Gov. Code, § 13967, trial court could properly consider evidence at trial and matters contained in probation officer's report].) Tellingly, defendant does not contend the trial court abused its discretion in setting the amount of the fine absent an ex post facto violation.

Because the restitution fine could have properly been imposed in the amount of $5,040 even under the version of section 1202.4 in effect at the time defendant committed the offense, the sentence was not unauthorized. (Cf. *People v. Walz* (2008) 160 Cal.App.4th 1364, 1368-1370; *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1533-1534.) Determination of the amount of the fine to be imposed involved consideration of a number of factual matters; hence, it was not one of the "obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings" and so are not forfeited by failure to object. (*People v. Smith*, *supra*, 24 Cal.4th at p. 852; see *People v. Welch* (1993) 5 Cal.4th 228, 235-236.) Defendant was on notice, from the probation officer's report, that a restitution fine in the amount of $5,040 was recommended by the probation officer, and he had the opportunity to object to the amount of that fine or its method of calculation at sentencing.[12] (Cf.

---

[12] In addition to his ex post facto claim, defendant asserts, without discussion, that use of the newer calculation formula violated his right to due process. Because defendant merely mentions the claim and does not expand on the issue with argument or citation to

15.

*People v. Sandoval* (1989) 206 Cal.App.3d 1544, 1550.)  The trial court was not required to explain its reasons for imposing a fine in that amount, and did not indicate it was using a specific formula.  (Cf. *In re Julian R.* (2009) 47 Cal.4th 487, 498-499.)  Under the circumstances, defendant forfeited any challenge to the amount of the fine by failing to object to it at sentencing.  (See, e.g., *People v. White* (1997) 55 Cal.App.4th 914, 916-917; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1396-1397; *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468-1469.)

## **DISPOSITION**

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
HILL, P.J.


_____
LEVY, J.

---

relevant authority, we decline to address it.  (See *People v. Hardy* (1992) 2 Cal.4th 86, 150.)